Crelia CONDEMARIN, individually and as Guardian Ad Litem of Leonel Condemarin, and Jose Condemarin, Plaintiffs and Appellants,

v.

UNIVERSITY HOSPITAL, University of Utah, R.M. Larkin, M.D., Gayle M. Carter, M.D., Carlos Dibble, M.D., John Soper, M.D., Jane and John Does I through X, Defendants and Appellees.

No. 20602.

Supreme Court of Utah.

May 1, 1989.

Rehearing Denied July 11, 1989.

Timothy C. Houpt, Paul R. Lovell, Salt Lake City, for plaintiffs and appellants.

Merlin Lybert, David G. Williams, R. Paul Van Dam, William T. Evans, Salt Lake City, for defendants and appellees.

DURHAM, Justice:

This case raises important questions of first impression regarding the Utah Governmental Immunity Act. Utah Code Ann. §§ 63–30–1 to –38 (1986 & Supp.1988). It comes to us on an interlocutory appeal from the denial of plaintiffs' motion for a summary judgment striking certain provisions of the Act as unconstitutional.[1]

The following facts were undisputed in the trial court. Plaintiff Crelia Condemarin, who was pregnant with her second child, went to Cottonwood Hospital in the early morning of May 19, 1982, after several hours of labor and a suspected premature rupture of membranes. Because her treating physician anticipated a high risk delivery, she was transferred on his orders to the University Hospital in Salt Lake City. Plaintiff Leonel Condemarin was born at the University Hospital that same day after an emergency caesarean section. Attending physicians concluded that he suffered fetal distress and was "severely asphyxiated" at birth, which resulted in "severe neurologic damage," including impairments of hearing, sight, and ability to be fed, as well as a seizure disorder and spasticity.

---

1. Plaintiffs alleged that sections 63–30–3 and –4 worked to abrogate a common law cause of action for negligence against employees of government-owned health care facilities.

At the time this lawsuit arose, sections 63–30–29 and –34 imposed a $100,000 limit on the amount a person could claim against an uninsured government entity because of injury or death. Section 63–30–29 was repealed in 1983, and a new provision in section 63–30–34 increased the permissible amount to $250,000. Repealed section 63–30–29 and former section 63–30–34 will be collectively referred to as the "recovery limits statutes" since they operated in conjunction to limit recovery. For purposes of this appeal, the $100,000 cap is applicable.

The minor plaintiff's treating physician believes that the child will have a normal life span as a severely retarded and handicapped person. He believes there is little doubt that plaintiff's physical and mental defects are related to the asphyxia at the time of his birth. It is likely that the cost of medical and custodial care related to the severe neurologic disorder of Leonel Condemarin in its various aspects will greatly exceed the sum of $100,000.

Each of the individual defendants in this action and each person who provided care to plaintiffs at the University Hospital during the labor and delivery was an employee of the University Hospital or the University of Utah and was acting as such at the time in question.

## I. Governmental Immunity and Hospitals

It is appropriate at this time in the evolution of the doctrine of governmental immunity to remind ourselves of its origins. In the 1961 case of *Muskopf v. Corning Hospital District*, 55 Cal.2d 211, 359 P.2d 457, 11 Cal.Rptr. 89 (1961), Justice Traynor detailed the history of the rule:

The shifting fortune of the rule of governmental immunity as applied to hospitals is illustrative of the history of the rule itself. From the beginning there has been misstatement, confusion, and retraction. At the earliest common law the doctrine of "sovereign immunity" did not produce the harsh results it does today. It was a rule that allowed substantial relief. It began as the personal prerogative of the king, gained impetus from sixteenth century metaphysical concepts, may have been based on the misreading of an ancient maxim, and only rarely had the effect of completely denying compensation. How it became in the United States the basis for a rule that the federal and state governments did not have to answer for their torts has been called "one of the mysteries of legal evolution." Borchard, Governmental Responsibility in Tort, 34 Yale L.J., 1, 4.

. . . .

None of the reasons for its continuance can withstand analysis. No one defends total governmental immunity. In fact, it does not exist. It has become riddled with exceptions, both legislative ... and judicial ..., and the exceptions operate so illogically as to cause serious inequality. Some who are injured by governmental agencies can recover, others cannot: one injured while attending a community theater in a public park may recover (*Rhodes v. City of Palo Alto*, 100 Cal.App.2d 336, 341–342, 223 P.2d 639), but one injured in a children's playground may not (*Farrell v. City of Long Beach*, 132 Cal.App.2d 818, 819–920, 283 P.2d 296); for torts committed in the course of a "governmental function" there is no liability, unless the tort be classified as a nuisance (*Phillips v. City of Pasadena*, 27 Cal.2d 104, 106, 162 P.2d 625). The illogical and inequitable extreme is reached in this case: we are asked to affirm a rule that denies recovery to one injured in a county or hospital district hospital, although recovery may be had by one injured in a city and county hospital. *Beard v. City and County of San Francisco*, 79 Cal.App.2d 753, 755–768, 180 P.2d 744.

*Id.* at 214–215, 216, 359 P.2d at 458–59, 460, 11 Cal.Rptr. at 90–91, 92 (citations omitted).

Immunity from liability existed as a matter of common law in Utah for government entities engaging in governmental, as opposed to proprietary, activities. *See Ramirez v. Ogden City*, 3 Utah 2d 102, 104, 279 P.2d 463, 464 (1955), and cases cited therein. Section 63–30–3 of the Utah Governmental Immunity Act, effective July 1, 1966, provides for governmental immunity, unless waived, for "all governmental entities ... for any injury which results from the exercise of a governmental function, governmentally-owned hospital ... and from an approved ... professional health care clinical training program conducted in either public or private facilities."

After the passage of the Act, this Court applied the traditional "governmental/proprietary" test until *Standiford v. Salt Lake City Corp.*, 605 P.2d 1230 (Utah

1980). In that case, this Court rejected the test:

> Originally, the proprietary-governmental distinction was created as a device to limit the harsh results produced by the doctrine of sovereign immunity. The doctrine operated on the basis that a public entity should be liable for the torts it committed in the exercise of a proprietary function but not for those committed in the exercise of a governmental function. See *Gillmor v. Salt Lake City*, 32 Utah 180, 89 P. 714 (1907); *Sehy v. Salt Lake City*, 41 Utah 535, 126 P. 691 (1912); *Alder v. Salt Lake City*, 64 Utah 568, 231 P. 1102 (1924); *Rollow v. Ogden City*, 66 Utah 475, 243 P. 791 (1926); *Niblock v. Salt Lake City*, 100 Utah 573, 111 P.2d 800 (1941). The distinction is, however, "one of the most unsatisfactory known to the law," Davis, *Administrative Law*, Ch. 9, "Tort Liability of Governments and of Officers," at 179.
>
> . . . .
>
> Clearly, factors which may lead to such contrary and unpredictable results do not provide an adequate test upon which governmental agencies can rely in planning their budgets and providing for their tort liability, whether by way of insurance coverage or otherwise.

*Id.* at 1233, 1235 (citation omitted). *Standiford* set forth a new standard for determining governmental immunity under section 63–30–3: "whether the activity under consideration is of such a unique nature that it can only be performed by a governmental agency or . . . it is essential to the core of governmental activity." *Id.* at 1236–37.

Under the Utah Governmental Immunity Act, immunity is specifically waived for all government entities (1) as to contractual obligations, (2) as to actions involving real and personal property, (3) for negligent operation of nonemergency motor vehicles, (4) for defective highways, bridges, and other structures, and (5) for nonlatent de-

fective conditions in public buildings and structures. Utah Code Ann. §§ 63–30–5 to –9. In addition, immunity of government entities is waived for injuries caused by employee negligence committed within the scope of employment except where the injuries arise out of certain specific activities listed in section 63–30–10(1)(a) to (*l*). Each of the excepted activities listed in section –10 is, interestingly, within the "core" of governmental functions discussed in *Standiford*. Each is of "such a unique nature that it can only be performed by a governmental agency or that it is essential to the core of governmental activity." *Standiford*, 605 P.2d at 1237.

The net result of this statutory classification scheme is that government-owned health care facilities, out of all the hundreds of government entities, have been singled out for "retained" immunity for *non*governmental functions. Moreover, the notion of "retained" immunity is descriptively inaccurate, since such facilities and activities were not protected by immunity at common law or under the original version of the Utah Governmental Immunity Act.[2]

> It seems plain enough that the intent of [section 63–30–4] was to retain the then existing law, both as to immunity and as to liability, except for the nonexempt areas specifically set forth in Section 63–30–10 of the new act, none of which covers the operation of a hospital. It is therefore our conclusion that proprietary functions of a municipality are not within the coverage of the Utah Governmental Immunity Act.

*Greenhalgh v. Payson City*, 530 P.2d 799, 801 (Utah 1975) (citation omitted).

The 1978 amendments to the Utah Governmental Immunity Act also changed section 63–30–4(4). The amendment states: "[N]o employee may be held personally liable for acts or omissions occurring during the performance of the employee's duties, within the scope of employment or under

---

**2.** The original version of the Utah Governmental Immunity Act, effective July 1, 1966, read as follows: "Except as may be otherwise provided in this act, all governmental entities shall be immune from suit for any injury which may result from the activities of said entities wherein said entity is engaged in the exercise and discharge of a governmental function."

color of authority, unless it is established that the employee acted or failed to act due to fraud or malice." Thus by simultaneously *adding* government-owned health care facilities to the category of government entities immune from suit, the legislature, via section 63–30–3, brought employees of those entities within the coverage of another change in the statute, in section 63–30–4(4). Consequently, immunity for the ministerial acts of employees of government entities performing nongovernmental functions was *created*, not "retained," by the 1978 amendments. Such immunity was a new development. In *Frank v. State*, 613 P.2d 517 (Utah 1980), this Court observed:

> The Utah Governmental Immunity Act has no application to individuals; its function is confined to governmental "entities." Common-law principles of sovereign immunity have developed, however, which offer protection to the individual under certain circumstances. The case of *Cornwall v. Larsen* [571 P.2d 925 (Utah 1977)] stands for the proposition that a governmental agent performing a discretionary function is immune from suit for injury arising therefrom, whereas an employee acting in a ministerial capacity, even though his acts may involve some decision making, is not so protected.
>
> . . . .
>
> Other reasons for the above holding are manifest. For one, it is contrary to reason to deny governmental immunity to a public employer and then grant it to the very employee allegedly causing the injury. Moreover, a grant of immunity in the present case would, of necessity, shield all practitioners employed, even under temporary contract from another source, by a governmental health care facility from any liability for malpractice.

*Frank,* 613 P.2d at 520 (citations omitted).

Thus the changes contained in the 1978 amendments to the Act created a number of classifications, including a special subclass of government-owned entities which are insulated, along with their employees, from liability for injuries resulting from nongovernmental functions. No other government entity is so insulated, and no other class of victims of negligence by government employees has been so treated.

The defendants in this case take the position that because sovereign immunity was a well-settled principle at the time the Utah Constitution was adopted, the challenged provisions of the Utah Governmental Immunity Act do not deprive plaintiffs of any remedies or property rights. This analysis overlooks the fact that at common law the proprietary or nongovernmental functions of government entities were *not* protected from liability in Utah, nor were their employees who performed those functions. Although it is generally true that the Utah Governmental Immunity Act expanded government liability, that is not the case with respect to proprietary or nongovernmental functions, and government employees performing operational (as opposed to discretionary) acts within the scope of governmental functions. In those two instances, the 1978 amendments restricted liability. In the first instance, where an employee is employed in nongovernmental activities, the right restricted is one which existed at common law.

Defendants also appear to regard the 1978 amendments to section 63–30–3 as having established that the operation of a governmentally owned health care facility is a "governmental function" under the state. It is true that this Court assumed as much in *Frank v. State*, 613 P.2d 517 (Utah 1980). We now observe, however, that the legislature did *not* make the operation of a health care facility a " 'governmental function' as contemplated by the statute," as the Court said in *Frank.* Rather, the legislature simply *added* to the category of government entities covered by section 60–30–3 (i.e., those exercising governmental functions) a new category consisting of government-owned health care facilities, whether or not those facilities are exercising governmental or nongovernmental functions. The plain language and structure of section 63–30–3 admit of no other construction. There is no doubt, of course, that health care facilities have the same

status under the Act as government entities performing governmental functions. But that is precisely the classification challenged here—the special treatment of one class of government entity for protection of all of its functions, governmental and nongovernmental.

Defendants' position therefore confuses the analysis in two ways: First, it assumes without examination that all of the functions of the University of Utah Medical Center qualify as "governmental functions." As pointed out earlier, there is no statutory or factual basis for such an assumption. From this assumption proceeds generalizations about the high risk and high cost of activities which must be performed by government entities. Those arguments can only be persuasive if real, essential governmental functions are at issue. They do not have the same weight if nonessential, nongovernmental functions are involved. *See generally Standiford*, 605 P.2d 1230; *Johnson v. Salt Lake City Corp.*, 629 P.2d 432 (Utah 1981). The Act does not purport to define the operation of a hospital per se as the exercise of a governmental function; it only gives hospitals the same status under the Act as government entities which *are* performing governmental functions.

Second, defendants' position collapses the classification issue into the recovery limits question.[3] This interferes with the analysis of the article I, section 11 questions under the Utah Constitution.[4] It is true, as defendants argue, that there is no fundamental right to recover unlimited damages from government entities performing governmental functions. In this case, however, the rights sought to be restricted include:

(1) The right to recover *any* damages from an *employee* performing nondiscretionary acts for a government employer who is engaged in *nongovernmental functions;*[5]

(2) The right to recover full, rather than limited, damages from a government entity *not performing governmental functions;* and

(3) The right to recover full, rather than limited, compensation from a governmental tort-feasor.

## II. *Equal Protection*

Under article I, section 24 of the Utah Constitution ("all laws of a general nature shall have uniform application"), a two-part test is necessary to ensure the uniform operation of the laws: "First, a law must apply equally to all persons within a class. Second, the statutory classifications and the different treatment given the classes must be based on differences that have a reasonable tendency to further the objectives of the statute." *Malan v. Lewis*, 693 P.2d 661, 670 (Utah 1984) (citations omitted). This Court recently noted:

State courts ... have a long tradition, stretching back into the nineteenth century, of being far less willing to find that legislative classifications underlying economic regulations are reasonable. While state courts have been more deferential to legislative classifications at some times than at others, they have never abandoned their review function to the degree that the federal courts have since the mid–1930's. As a result, to pass state constitutional muster, a legislative measure must often meet a higher de facto standard of reasonableness than would be imposed by the federal courts.

*Mountain Fuel Supply Co. v. Salt Lake City Corp.*, 752 P.2d 884, 889 (Utah 1988). We therefore first examine the reasonableness of the classifications in this statutory scheme and then assess the relationship

---

**3.** *See* note 1 *supra.*

**4.** That provision reads as follows:

All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal in this State, by himself or counsel, any civil cause to which he is a party.

**5.** Of course, the question of whether the University of Utah Medical Center is performing an essential governmental function has not been decided in this case.

between the classifications and the legislative objective.

As noted earlier, there are several classifications created by the statute at issue. Plaintiffs focus on the distinctions established between malpractice victims of governmental tort-feasors and victims of non-governmental tort-feasors. A more subtle line, however, is drawn between the tort victims of different government entities and their employees, and that line depends upon the scope of the activities causing the injuries. Under the standard put forth by this Court in *Standiford*, "governmental functions" do not include activities not essential to government. Under section 63–30–3, however, even "nonessential" activities are protected by immunity when they are engaged in by a health care facility. That fact, in combination with the multiple waivers for numerous other governmental functions (most of them "essential"), results in a distinction between the tort victims of virtually every operational-level act classified as essential and the victims of medical malpractice by a government-employed or government-supervised medical service provider. As noted earlier, this is so because the Act waives immunity as to any contractual obligation, as to actions involving property, as to the negligent operation of nonemergency motor vehicles, as to injuries caused by defective, unsafe, or dangerous conditions of highways, public buildings, and other structures. Utah Code Ann. §§ 63–30–5, –9 (1986). Scrutiny of section 63–30–10, which contains a waiver of immunity for negligence and then a list of exceptions to the waiver, demonstrates that each exception relates directly to a "core" or "essential" function of government, e.g., law enforcement, health and welfare regulations, crowd control, tax assessment, corrections, land management, fire fighting, and so on.

The net result of this classification scheme is that the state, while choosing to conduct many enterprises that are not essential and necessary to governing, has chosen to retain immunity for only one of those activities—health care services—and to extend that immunity to its employees who function at an operational level rather than at a policy-making one. In doing so, the state has extended governmental immunity further than it ever reached at common law and, in the process, has abrogated a well-established common law right of recovery.

The amounts contained in the recovery limits statutes created yet another classification in addition to those summarized above. Not only are victims of medical malpractice by government personnel treated differently from victims of private tort-feasors, but also there are classifications within the victim group itself. Those whose injuries are minor may seek and recover all of their economic damages and some measure of noneconomic damages up to the recovery cap ($100,000 at the time of these injuries). Those whose economic losses approach or equal the statutory limit may recover only those losses and will receive no compensation for noneconomic losses. Finally, those whose economic losses exceed the statutory limit are precluded from even recovering out-of-pocket costs resulting from their injuries. The present case illustrates how grave the disparity between the limit and actual costs may be. The expenses of the minor plaintiff's medical care and treatment and his future education and maintenance as a severely handicapped person are likely to be many times the recovery limit created by the statute. The recovery cap created a distinction between victims of governmental tort-feasors, depending on the severity of their injuries: the mildly injured receive all; the moderately injured, most; and the severely injured, only a fraction or none of their economic and/or noneconomic damages.

To summarize, the reasonableness of the statutory classifications depends on the logic of the distinctions made, apart from the relationship between the classification and the legislative objective. There are two general types of classifications at issue here: first, a classification consisting of government-owned health care entities, whether or not they perform functions essential to the process of governing, as opposed to all other government entities, whose immunity depends on whether the

activity causing the injury is a governmental function; and second, an indirect classification of injured victims which depends on whether their losses are less than, equal to, or greater than the statutory recovery cap and on whether those losses are largely economic, largely pain and suffering, or both.

As to the first general classification, defendants argue that it is rational to afford government-owned health care facilities special treatment vis-a-vis other government-owned entities because it is a reasonable means to protect the public treasury from the costs of medical malpractice insurance and/or large recoveries. The recovery limit is justified on the same basis. Under a rational basis standard of review, defendants conclude that the deprivation of common law rights to recovery and the arbitrary limitation of recovery to an amount that may or may not compensate victims even for their out-of-pocket medical expenses is rational. This conclusion reflects the almost total deference afforded legislative distinctions not based on suspect classifications under a traditional equal protection analysis. *See* Redish, *Legislative Response to the Medical Malpractice Insurance Crisis: Constitutional Implications*, 55 Tex.L.Rev. 759, 769–82 (1977). We are convinced that such deference is inappropriate when dealing with the fundamental principle of American law that victims of wrongful or negligent acts should be compensated to the extent that they have been harmed.

The New Hampshire Supreme Court was correct in identifying the specific right to recover for negligently caused injuries as an "important substantive right." *Carson v. Maurer*, 120 N.H. 925, 931, 424 A.2d 825, 830 (1980).

The importance of this right is seen not only from a purely compensatory perspective, but also as a function of the close relation it bears to other rights which are fundamental. Not only is the right to be compensated for injuries closely related to fundamental rights, but additionally, it does not logically fit into the "commercial" rights description

which is characteristic of the rational basis standard of judicial review.

Note, *Target Defendants and Tort Law Reform: A Perspective on Medical Malpractice and Municipal Liability*, 11 Vt.L. Rev. 535, 546 (1986) (citations omitted).

The court in *Carson* said, "Whether the ... statute can be justified as a reasonable measure in furtherance of the public interest depends upon whether the restriction of private rights sought to be imposed is not so serious that it outweighs the benefits sought to be conferred upon the general public." *Carson*, 120 N.H. at 933, 424 A.2d at 831 (citations omitted). The court was not willing to undertake an independent examination of the legislative justification for the statute, but it was willing to decide "whether the statute has a fair and substantial relation to this legitimate legislative objective and whether it imposes unreasonable restrictions on private rights." *Id.* at 934, 424 A.2d at 832.

It will be seen hereafter that the New Hampshire court's "middle tier" or "intermediate standard of review" permits precisely the balancing process that can be undertaken with a due process approach. The due process approach is more straightforward, but even under equal protection, some form of heightened scrutiny is warranted by the type of legislation at issue here. We applied such a "realistic rational basis" review to Utah's automobile guest statute in *Malan v. Lewis*, 693 P.2d 661 (Utah 1984), and we should do so here. In explaining what such a realistic review would entail, I quote liberally from the dissent in *Fein v. Permanente Medical Group*, 38 Cal.3d 137, 695 P.2d 665, 211 Cal.Rptr. 368 (1985), which calls the majority to task for abandoning that standard of equal protection analysis in California.

At issue in *Fein* were provisions of California's Medical Injury Compensation Reform Act (MICRA) which, among other things, limited recovery of noneconomic damages for medical malpractice. The majority of the court upheld the limitations against an equal protection challenge. The dissent observed:

The majority's acceptance of rationales so broad and speculative that they could justify virtually any enactment calls attention to the implications of the MICRA cases for equal protection doctrine in this state. In *American Bank [and Trust Company v. Community Hospital of Los Gatos–Saratoga, Inc.], supra,* 36 Cal.3d [359] at page 398, 204 Cal.Rptr. 671, 683 P.2d 670 [ (1984) ] (dis. opn. of Bird, C.J.), I joined a majority of this court in rejecting the notion of "intermediate" equal protection scrutiny. However, I conditioned that rejection on the belief—grounded in the past practice of this court—that the alternative was a two-tier system with a meaningful level of scrutiny under the lower tier. (*Id.,* at pp. 398–401, 204 Cal.Rptr. 671, 683 P.2d 670; see also *Hawkins v. Superior Court* (1978) 22 Cal.3d 584, 607–610, 150 Cal.Rptr. 435, 586 P.2d 916 (conc. opn. of Bird, C.J.).)

In particular, I relied on *Brown v. Merlo, supra,* 8 Cal.3d 855, 106 Cal.Rptr. 388, 506 P.2d 212 [ (1973) ]. In *Brown,* this court conducted a serious and sensitive inquiry into the nature and purposes of the automobile guest statute. The court demanded not only that the enactment might tend to serve some conceivable legislative purpose, but also that each classification bear a fair and substantial relationship to a legitimate purpose. (*Id.,* at p. 861, 106 Cal.Rptr. 388, 506 P.2d 212.) The guest statute failed to pass this level of scrutiny since the classification of all automobile guests bore an insufficiently precise relation to the asserted purposes. For example, the classification was held to be overinclusive with regard to the purpose of preventing collusive suits. (*Id.,* at p. 877, 106 Cal. Rptr. 388, 506 P.2d 212.) *Brown* was subsequently followed in *Cooper v. Bray, supra,* 21 Cal.3d 841, 148 Cal.Rptr. 148, 582 P.2d 604 [ (1978) ].

If applied in the present case, the mode of analysis used in *Brown* and *Cooper* would compel invalidation of the $250,000 limit, which is *grossly* underinclusive by any standard. Millions of healthcare consumers stand to gain from whatever savings the limit produces. Yet, the entire burden of paying for this benefit is concentrated on a handful of badly injured victims—fewer than 15 in the year MICRA was enacted. (See *Report of the Auditor General, supra,* at p. 31.) Although the Legislature normally enjoys wide latitude in distributing the burdens of personal injuries, the singling out of such a minuscule and vulnerable group violates even the most undemanding standard of underinclusiveness.

*Fein,* 38 Cal.3d at 174–75, 695 P.2d at 691–92, 211 Cal.Rptr. at 394–95 (Bird, C.J., dissenting).

The Idaho Supreme Court in *Jones v. State Board of Medicine,* 97 Idaho 859, 555 P.2d 399 (1976), has also articulated a heightened standard of review based on the federal intermediate equal protection review:

In the usual and ordinary case where a statutory classification is to be tested in the context of equal protection, judicial policy has been, and continues to be, that the legislation should be upheld so long as its actions can reasonably be said to promote the health, safety and welfare of the public. Nevertheless, where the discriminatory character of a challenged statutory classification is apparent on its face and where there is also a patent indication of a lack of relationship between the classification and the declared purpose of the statute, then a more stringent judicial inquiry is required beyond that mandated by *McGowen [v. Maryland,* 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) ]. That common thread runs through all the cases in which the *Royster–Reed* test has been applied by this Court.

Here it is apparent from the face of the Act that a discriminatory classification is created based on the degree of injury and damage suffered as a result of medical malpractice. Rather obviously although the Act is said to be designed to insure continued health care to the citizens of Idaho it cannot do other than confer an advantage on doctors and hospitals at the expense of the more serious-

ly injured and damaged persons. In the absence of any record we are without information as to the factual basis underlying the purported correlation between limitation of claimant recovery and the promotion of health care for the people of Idaho. We therefore deem it essential that the purposes of the Act and the relationship of the legislatively designed means to accomplish those purposes must be examined.

*Id.* at 871, 555 P.2d at 411.

Other courts have applied a heightened standard of equal protection scrutiny to statutes limiting recovery rights in the medical malpractice area. *See Coburn ex rel. v. Agustin,* 627 F.Supp. 983, 991–97 (D.Kan.1985); *Farley v. Engelken,* 241 Kan. 663, 740 P.2d 1058, 1063–65 (1987); *Arneson v. Olson,* 270 N.W.2d 125, 132–33 (N.D.1978); *Hoem v. State,* 756 P.2d 780 (Wyo.1988). Some courts have characterized their review as one at an intermediate level, and some have referred to it as a "realistic" review under the rational basis standard. Both approaches, however, involve a real and thoughtful examination of legislative purpose and the relationship between the legislation and that purpose. In the present case, the legislature has not only limited recovery, but it has also extended partial governmental immunity to restrict rights which existed at common law. Therefore, I would apply a heightened standard of review under equal protection.

## III. *The Due Process Alternative*

The parties argued this case as an equal protection problem. The traditional rational basis approach, however, takes inadequate account of the seriousness of the abrogation of personal rights accomplished by the Act, and a more straightforward balancing process is required. That balancing should be accomplished by means of a due process, rather than an equal protection, analysis.[6]

Historically, the overlap between equal protection analysis and due process analy-

sis has been considerable. As this Court phrased the test for equal protection under article I, section 24 of the Utah Constitution in *Malan v. Lewis,* 693 P.2d 661 (Utah 1984), "First, a law must apply equally to all persons within a class. Second, the statutory classifications and the different treatment given the classes must be based on differences that have a reasonable tendency to further the objectives of the statute." *Id.* at 670 (citations omitted). Citing *McLaughlin v. Florida,* 379 U.S. 184, 191, 85 S.Ct. 283, 288, 13 L.Ed.2d 222 (1964), we agreed that "[t]he courts must reach and determine the question whether the classifications drawn in a statute are reasonable in light of its purpose...." *Id.* at 673. Most recently, in *Mountain Fuel Supply Co. v. Salt Lake City Corp.,* 752 P.2d 884, 890 (Utah 1988) (citation omitted), we phrased the test as follows: "[The] test to be applied under article I, section 24 is whether the classification of those subject to the legislation is a reasonable one and bears a reasonable relationship to an achievement of the legitimate legislative purpose."

The similarity of that test to a means-end review under the doctrine of due process is striking: "If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied...." *Nebbia v. New York,* 291 U.S. 502, 537, 54 S.Ct. 505, 516, 78 L.Ed. 940 (1934); *see also Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 84–85, 100 S.Ct. 2035, 2042–2043, 64 L.Ed.2d 741 (1980).

This overlap is not surprising in view of the fact that both tests seek to ensure, as a matter of constitutional doctrine, that "legislative action ... be rationally related to the accomplishment of some legitimate state purpose." Bennett, *"Mere" Rationality in Constitutional Law: Judicial Review and Democratic Theory,* 67 Calif.L. Rev. 1049 (1979).

This rationality requirement has been advanced as the most minimal of consti-

6. Justice Stewart's opinion takes the opposite position, but the operation and effect of the equal protection test he describes is identical to the due process analysis this opinion advocates.

tutional limitations on legislative action. It has been variously phrased and has appeared in several constitutional guises, most prominently as an elaboration of the due process and equal protection guarantees.

*Id.* (footnote omitted).

The difficulty with the equal protection analysis undertaken by the dissent is that it does not account for what is or what should be actually going on in this Court's scrutiny of legislative abrogation of common law causes of action.[7] Characterizing plaintiffs' rights here as "nonfundamental" would virtually insure that the legislative action will be found constitutional under the rational basis standard. As previously pointed out, some commentators and a number of courts have incorporated an intermediate or realistic level of scrutiny into their equal protection framework in order to achieve the flexibility needed to balance state interests against individual rights. I suggest that a more open, straightforward performance of the balancing function under the due process framework is in order.

Because the disputes that arise under the rubric of the Equal Protection Clause have to do with the relative merits of competing, public policies, judicial decisions obscure the central issues in such cases to the extent that they are based on discussions of a statute's rationality. The nature of the conflict between the political values at stake as well as the underlying bases of judicial reasoning would be made more explicit if the competing public policies were weighed outright....

Note, *Legislative Purpose, Rationality, and Equal Protection*, 82 Yale L.J. 123, 154 (1972–73) (footnotes omitted).

We are required to assess the reasonableness of the legislative expansion of governmental immunity contained in section 63–30–10 against the degree of intrusion on rights protected by the Utah Constitution. That is the essence of the re-quirement of due process under our constitution. *See* Utah Const. art. I, § 7.

Article I, section 11 of the Utah Constitution guarantees: "[E]very person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law...." In *Berry ex rel. Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 675 (Utah 1985), we determined that the clear implication of this language is "that an individual [may] not be arbitrarily deprived of effective remedies designed to protect basic individual rights."

[T]he basic purpose of Article I, section 11 is to impose some limitation on [the power of the Legislature to create new rules of law and to abrogate old ones] for the benefit of those persons who are injured in their persons, property or reputations since they are generally isolated in society, belong to no identifiable group, and rarely are able to rally the political process to their aid.

*Id.* at 676.

To a degree, the open courts provision is an extension of the due process clause. Indeed, the open courts provision and the due process clause also have an overlapping function, to some extent, with respect to the abrogation of causes of action. If the Legislature were to abolish all causes of action for injuries to one's person or property caused by defective products and provide no substitute equivalent remedy, we have little doubt that that would violate section 11, and perhaps even the due process clause of Article I, section 7.

*Id.* at 679.

Indeed, the two-part test articulated in *Berry,* at least in part, requires a classic due process analysis:

First, section 11 is satisfied if the law provides an injured person an effective and reasonable alternative remedy ... for vindication of his constitutional interest. The benefit provided by the substitute must be substantially equal in value

---

7. A further inadequacy of the dissent's approach to this problem is its failure to distinguish between state and federal constitutional provisions and analysis. Federal law on this ques-tion is neither binding on this Court nor particularly helpful. I note that I join in the concurring portions of Justice Zimmerman's opinion to that effect.

or other benefit to the remedy abrogated in providing essentially comparable substantive protection to one's person, property, or reputation, although the form of the substitute remedy may be different.

. . . .

Second, if there is no substitute or alternative remedy provided, abrogation of the remedy or cause of action may be justified only if there is a clear social or economic evil to be eliminated and the elimination of an existing legal remedy is not an arbitrary or unreasonable means for achieving the objective.

*Id.* at 680.

The analytic process presented in *Berry* under article I, section 11 of the Utah Constitution was referred to as a "balancing analysis." *Id.* at 683. The Court examined the legitimacy of the legislative purpose and the extent to which said purpose was reasonably and substantially advanced by the means utilized and compared those "benefits" to the denial of rights protected by article I, section 11. The opinion identified a special class of constitutional rights which are afforded protection under article I, section 11. Legislative attempts to abrogate those rights should be closely examined by this Court and struck down when the disability they seek to impose on individual rights is too great to be justified by the benefits accomplished or when the legislation is simply an arbitrary and impermissible shifting of collective burdens to individual citizens.

By means of (1) extending immunity to employees of all government-owned health care facilities and (2) imposing a blanket cap on all recoveries, the legislature has sought to respond to what the University Hospital and the attorney general in his amicus brief describe as a "financial crisis" in state liability and liability insurance. No factual information regarding the alleged crisis has been cited to this Court, either from the legislative history of the Act, the evidentiary record in the court below, or reliable sources of which this Court could legitimately take judicial notice. Indeed, most of the attorney general's sources are newspaper articles from other states, and the majority of them deal with municipal, rather than state, liability problems. The state asks this Court to engage in the kind of speculation about legislative rationale associated with the "any conceivable rational basis test." However, because of the constitutional status of the right to a remedy for damage to one's person under article I, section 11, more is required.

A legislative determination to interfere with, limit, or abrogate the availability of remedies for injuries to person, property, or reputation requires an important state interest and a rational means of implementation. The greater the intrusion upon the constitutionally protected interest, the greater and more explicit the state's reasons must be. It is necessary for the legislature, first, and this Court, second, to balance the weight of the governmental interest at stake against the countervailing importance of the individual rights being compromised.

This due process approach offers some degree of flexibility. Under equal protection, the selection of the standard of review virtually determines the outcome, and selection of the standard of review depends in turn on a rather rigid system of classification of the individual rights in question.

Most frequently, the level of protection which the courts will afford the constitutional provision depends on the nature of the substantive right being asserted in the underlying claim. If the substantive right is deemed to be "fundamental," statutory restrictions will be examined very closely under the strict scrutiny test; only the presence of a compelling state interest will justify the restriction or denial of access to the courts. If, on the other hand, the substantive right being asserted is not the subject of a specific constitutional protection and is therefore not fundamental, then the rational basis test provides that access to the courts may be restricted if a rational or reasonable basis for the restriction is shown.

Note, *Constitutional Law: Statutorily Required Mediation as a Precondition to Lawsuit Denies Access to the Courts,* 45

Mo.L.Rev. 316, 319–20 (1980) (footnotes omitted).

State supreme courts have uniformly held that medical malpractice legislation does not create suspect classifications or implicate fundamental interests.[8] Accordingly, no state court has applied or discussed applying the strict scrutiny test to equal protection challenges to damage limitation laws.

Rather, the decisive issue in the cases has been the decision whether to apply the rational basis test or an intermediate level of review. Just as the choice between the strict scrutiny and rational basis tests is outcome determinative under traditional equal protection analysis, it appears that the choice between the rational basis test and the intermediate test will predict the result of equal protection challenges to medical malpractice damages limitations statutes. Of eight courts that have discussed the equal protection issue, three applied an intermediate test, and four applied the rational basis test. In one the standard chosen was unclear. Of the three courts that chose intermediate scrutiny, two held the statute unconstitutional and one remanded for more information. *In contrast, no state court that has applied the rational basis test has failed to find the statute in question constitutional.*

Richards, *Statutes Limiting Medical Malpractice Damages*, 32 Fed'n Ins.Couns.Q. 247, 253 (1982) (citations omitted; emphasis added).

Once the applicable standard of review is determined, it is applied to the damage limitation statute. If the rational basis test is applied, the court generally will defer to the legislative judgment, reflected in the statute, that the classification is rationally related to a legitimate state purpose. For instance, in *Fein v. Permanente Medical Group*, the plaintiff argued that the California statute limiting pain and suffering damages in medical malpractice cases violated equal protection because "the alleged 'crisis'

pursuant to which the legislation was enacted was largely fabricated." The court noted that the plaintiff was asking it to reconsider the legislature's findings, which it refused to do under the rational basis test.

In stark contrast, when the intermediate level test is applied, the courts are willing to scrutinize the basis for the legislative decision to limit damages far more closely. The Idaho Supreme Court was clearly skeptical that any crisis existed in Idaho and remanded for determination of whether malpractice claims had caused increased insurance rates and whether the damage limitation would actually stabilize insurance rates. The New Hampshire Supreme Court was unable to find the necessary relationship between the legislative goal of rate reduction and the damage limitation statute because "paid out damage awards constitute only a small part of total insurance premium costs [and] few individuals suffer noneconomic damages in excess of $250,000."

*Thus, the functional difference between the rational basis test and the intermediate test is the degree to which the legislative judgment reflected in the statute will be examined. The practical difference is that under the rational basis test the statute will surely be found constitutional while the opposite result is likely if the intermediate test is applied. At any rate, the crucial issue in such cases remains which standard of review the court chooses to apply.*

*Id.* at 256–57 (citations omitted; some emphasis added); *see also* Farrell, *Virginia's Medical Malpractice Cap and the Doctrine of Substantive Due Process*, 23 Tort & Ins.L.J. 684 (1988).

As was clear in our opinion in *Berry*, this Court is not prepared to hold that the rights protected in article I, section 11 are "fundamental" in the traditional equal protection sense.

8. But see *White v. State,* 203 Mont. 363, 661 P.2d 1272 (1983), in which the Montana Supreme Court held that the state constitutional right to

remedy for injuries was fundamental and required the application of strict scrutiny to a governmental immunity statute.

[S]ection 11 rights are not always paramount, either. They do not sweep all other constitutional rights and prerogatives before them.... Similarly, legal causes of action which provide remedies that protect section 11 interests may, in some cases, have to yield to the power of the Legislature to promote the public health, safety, morals, and welfare.

For example, the Legislature has abolished certain common law remedies for personal injuries and substituted other remedies pursuant to the Workmen's Compensation Act and the Occupational Disease Act. These remedies are different from, and in some ways, broader than, the common law remedies they displace. The Legislature has also substituted a nonjudicial remedy for certain kinds of damages caused by personal injuries sustained in automobile accidents. The Utah No–Fault Automobile Insurance Act, U.C.A., 1953, § 31–41–1, *et seq.*, provides an insurance remedy for special damages in lieu of a common law remedy.

*Berry*, 717 P.2d at 677 (citation and footnotes omitted).

On the other hand, by construing article I, section 11 in *Berry* as "an extension of the due process clause," we committed ourselves to something more than a "rational basis" deference under the equal protection doctrine.

In sum, section 11 does not recede before every legislative enactment, but neither may it be applied in a mechanical fashion to strike every statute with which there may be conflict....

We hold that section 11 ... and the prerogative of the legislature are properly accommodated by applying a two-part analysis. First, section 11 is satisfied if the law provides an injured person an effective and reasonable alternative remedy "by due course of law" for vindication of his constitutional interest. The benefit provided by the substitute must be substantially equal in value or other benefit to the remedy abrogated in providing essentially comparable substantive protection to one's person, property,

or reputation, although the form of the substitute remedy may be different....

Second, if there is no substitute or alternative remedy provided, abrogation of the remedy or cause of action may be justified only if there is a clear social or economic evil to be eliminated and the elimination of an existing legal remedy is not an arbitrary or unreasonable means for achieving the objective.

*Id.* at 680.

Thus, we identified the right to recover for personal injuries as an important substantive right. "The right to be [compensated] for personal injuries is a substantial property right, not only of monetary value but in many cases fundamental to the injured person's physical well-being and ability to continue to live a decent life." *Hunter v. North Mason High School Dist.*, 85 Wash.2d 810, 814, 539 P.2d 845, 848 (1975). *Berry* articulated the outlines of what is essentially a due process balancing test, wherein the exigencies associated with the "social or economic" evils addressed by legislation must be weighed against the reasonableness of its intrusion upon personal rights. We simultaneously identified in *Berry* a separate due process approach, the "quid pro quo" or "substitute remedy" test. The right to recover for personal injuries should be evaluated under these tests.

## IV. *Due Process Analysis*

To the extent that section 63–30–3 created immunity for employees of government-owned health care facilities not engaged in governmental functions, it created immunity where none had existed at common law. Furthermore, excepting such entities from the broad scope of entities and activities for which immunity is waived in sections 63–30–4 through –10 also treated health care facilities differently from all other government entities irrespective of the governmental-nongovernmental activities distinction (i.e., immunity was waived as to many other entities for activities that were clearly essential to the core of government). This extension of immunity had the effect of substituting the remain-

ing statutory negligence remedy for a common law cause of action against both the entity and the allegedly negligent employee. *See Frank v. State*, 613 P.2d 517, 520 (Utah 1980). Tort victims under this scheme received the right to recover from health care entities up to a maximum of $100,000, regardless of the seriousness of their injuries. The victims' burden of showing fault as a precondition to recovery was not changed.[9]

If we were prepared to sustain the $100,000 recovery limitation, we would be constrained to conclude that this statutory provision fails the adequate substitution remedy portion of the test in *Berry*. In the absence of any damages limitation, however, the question would become a much closer one. The tort victim under those circumstances, while losing the right to recover from the government employee, would retain the right to recover from the government entity for the negligence of its employee. There is no reason to believe that individual employees of health care entities are more able than their employers to respond in damages or that the entities themselves are likely to be judgment-proof. It would seem to make no difference to the employee unless the total amount of recovery is affected by the statute. For that reason, it appears to be only to the extent that section 63–30–3 brings health care entities (not engaged in essential governmental activities) within the purview of the recovery limits statutes that it is challenged by these plaintiffs. The determinative question is therefore whether the recovery cap can be regarded as a reasonable, nonarbitrary limitation on the right to recover for tortious injuries in a context where a common law right to recovery has been restricted.

With a damage limit of $100,000, the legislature has determined that the cost of protecting the public treasury shall be borne by those few persons most seriously injured by the negligence of government health care entities and their employees. Having first expanded immunity and then waived it, the legislature set out to accord the victims of governmental tort-feasors the same status as victims of private tort-feasors. With the recovery cap, however, the legislature has in effect retracted the waiver of immunity for the seriously injured. The statute directly prohibits those who are injured from recovering compensation for proven injuries solely because those injuries have been inflicted by government health care providers.

Defendants essentially argue that government health care entities cannot afford to pay for the serious injuries they cause and that the state may therefore choose to compensate fully those whose injuries are minor but make what may be token payments to those with severe injuries. The circumstances of these plaintiffs are illustrative; it is unlikely that the recovery limit amount would pay more than a fraction of plaintiffs' actual medical expenses, leaving nothing to offset the expenses of lifetime care. Thus, the burden of this legislative attempt to protect the state treasury falls exclusively on those most in need of financial protection.

In a related analytic context, a substantial majority of courts addressing damages limits in medical malpractice statutes have invalidated those limits, usually on equal protection grounds, but also occasionally under a due process rubric. *See, e.g., Coburn ex rel. Coburn v. Agustin*, 627 F.Supp. 983, 997 (D.Kan.1985); *Waggoner v. Gibson*, 647 F.Supp. 1102, 1107 (N.D. Tex.1986); *Wright v. Central Du Page Hosp. Ass'n*, 63 Ill.2d 313, 329–30, 347 N.E.2d 736, 743 (1976); *Kansas Malpractice Victims v. Bell*, 243 Kan. 333, 757 P.2d 251 (1988); *Farley v. Engelken*, 241 Kan. 663, 678, 740 P.2d 1058, 1068 (1987); *Carson v. Maurer*, 120 N.H. 925, 936, 424 A.2d 825, 838 (1980); *Arneson v. Olson*, 270 N.W.2d 125, 136 (N.D.1978); *Simon v. St. Elizabeth Medical Center*, 3 Ohio Op.3d 164, 166–167, 355 N.E.2d 903, 906–07 (Ohio Misc.1976) (dictum); *Baptist Hosp. of Southeast Texas, Inc. v. Baber*, 672 S.W.2d

9. By contrast, the fault requirement was eliminated in Utah's Workers' Compensation Act, Utah Code Ann. § 35–1–107 (1988), and the Utah No–Fault Automobile Insurance Act, Utah Code Ann. § 31A–22–309 (1986).

296, 298 (Tex.1984); *cf. Smith v. Department of Insurance,* 507 So.2d 1080 (Fla. 1987); *Jones v. State Bd. of Medicine,* 97 Idaho 859, 876, 555 P.2d 399, 416, *cert. denied,* 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1976) (remanding for factual determination on whether a medical malpractice crisis actual existed); *Lucas v. United States,* 757 S.W.2d 687 (Tex.1988); *Hoem v. State,* 756 P.2d 780 (Wyo.1988). *But see Johnson v. St. Vincent Hosp., Inc.,* 273 Ind. 374, 400, 404 N.E.2d 585, 601 (1980) (upholding limitations where there is a partial alternative remedy).

The kind of "crisis" intervention which motivated the passage of medical malpractice damages limits strongly resembles the "crisis rationale" relied upon by the state in this case to justify limits on damages in governmental immunity cases.[10] The focus on increasing insurance premiums and the argument that governments (like some physicians) will be "out of business" absent legislative intervention are strikingly similar. It must always be borne in mind that the legislature has here chosen both to *expand* governmental immunity protection beyond its scope at common law and to draw limits which affect only a few victims after a blanket waiver of immunity for certain kinds of negligence. "A crisis," as political scientist Paul Starr has noted, " 'can be a truly marvelous mechanism for the withdrawal or suspension of established rights, and the acquisition and legiti-

mation of new privileges.' " Note, *California's Medical Injury Compensation Reform Act: An Equal Protection Challenge,* 52 So.Cal.L.Rev. 829, 935 n. 623 (1979) (quoting Bernzweig, forward to T. Lombardi, Jr., *Medical Malpractice Insurance,* 118–19 (1978)).

The harsh, unfair, and irrational impact of the doctrine of governmental immunity historically has led courts, and then legislatures, to respond by making governments more readily accountable for the costs of governing:

> Even where liability would not be an unwanted deterrence, the question remains of the extent to which it is desirable to compensate out of public funds those injured by what government does in the public interest. The older view chose to sacrifice the individual claim altogether, except within the narrow confines of a taking of property in the constitutional sense. But the whole trend of modern thinking is toward compensating the victims of enterprise and distributing their losses. Even conservatives would do this where the victim is innocent, where his injury is of a kind already recognized in private tort law, and where there is fault in conducting the enterprise. The device of government liability offers machinery for both compensation and distribution; it should be used to compensate the victims of government at

---

**10.** The following commentary describes what is meant by crisis rationale in this context:

> The medical malpractice crisis is neither a unique nor an isolated phenomenon; rather, it is one of the series of *crisis-legislation sequences* which threaten to erode the established system of tort law. The most contemporary of these crises concerns municipal liability and the uninsurability of municipal corporations.
>
> As with the medical malpractice crisis, those affected by the current dilemma in municipal liability have identified the tort system as the root of the problem. A two-fold premise associated with these crises is that the fault lies in the tort system, and that limitations on the rights of victims are necessary in order to alleviate the problem. Without more, acceptance of this premise requires a *leap of faith* because the means-end connection is essentially unsupported. The premise fails because it is neither guaranteed nor likely that limit-

ing the rights of victims will produce the benefits envisioned by the legislatures. Moreover, the premise is based on the erroneous assumption that the exercise of victims' rights is the exclusive cause of the liability insurance crisis.

> . . . .

> Crisis legislation is neither a new nor a necessarily undesirable feature of the American legal and political process. In fact, it may very well demonstrate legislative ability to act quickly and decisively in the face of serious social, economic, or political problems. There are, however, serious and legitimate concerns over the use and the potential abuse of such drastic measures.

Note, *Target Defendants and Tort Law Reform: A Perspective on Medical Malpractice and Municipal Liability,* 11 Vt.L.Rev. 535, at 537, 542 (footnotes omitted); *see also* Nader, *The Assault on Injured Victims' Rights,* 64 Den.U.L.Rev. 625 (1988).

least to the full extent of the fault principle except in situations where there are cogent reasons of extrinsic policy for withholding compensation.... [W]here such claims represent the kind of injury courts conventionally recognize—especially physical injury ...—their magnitude simply reflects the size of the injury which large-scale and perhaps increasingly dangerous activity by government may inflict on its citizens. It would change the essential picture only when the liability was so crushing that it reflected wholesale destruction of the social wealth in a way that would spell a breakdown for any system of liability.

James, *Tort Liability of Governmental Units and Their Officers*, 22 U.Chi.L.Rev. 610, 653–54 (1955) (footnotes omitted).

Some commentators have gone so far as to argue that "the naked existence of sovereign immunity constitutes an equal protection violation by irrationally distinguishing between victims of private and sovereign negligence." Murray & Murray, *The Unconstitutionality of Sovereign Immunity in Ohio—Last Stand for the Illegitimate King*, 18 U.Tol.L.Rev. 77, 112 (1986).[11] I do not advocate this extreme position. This Court, however, ought not defer to legislative retention or expansion of governmental immunity which unreasonably burdens important constitutional rights. The recovery limitation in the Utah Governmental Immunity Act on all damages caused by government-owned health care providers and their employees is such an unreasonable burden. There is no factual showing in the legislative history or the trial court that the recovery limitation is reasonably necessary for preservation of the public treasury. It is true, of course, that there will be less cost to the state and insurance will be more readily obtainable if the state does not have to respond in damages in excess of $100,000 for injuries caused by its health care entities and employees or insure against those damages. However, before the state is permitted to conserve those monies at the expense of seriously injured citizens, its citizens are entitled to a showing in the courts that a measure so drastic and arbitrary as a $100,000 cap on all damages is urgently and overwhelmingly necessary.

We do not hold that the state may not preserve its ability to govern by avoiding payments for catastrophic losses. If the actual solvency of a public entity, such as the state, is threatened, the balance obviously might shift in favor of the collective public interest in the continuity of public services. Furthermore, in view of the economic uncertainties in question, it might be reasonable, we believe, for the legislature to settle upon and justify an approximate figure demonstrated to be large enough to compensate a majority of injuries (minor and serious) but not so large as to threaten or ensure insolvency in response to one judgment or a major catastrophe. Over twenty years ago, Professor Arvo Van Alstyne, in his comprehensive essay *Governmental Tort Liability: A Decade of Change*, 1966 Univ.Ill.L.Forum 919 (1966), anticipated the balancing process that is necessary:

> The fiscal approach assumes the validity of the fears, often articulated by spokesmen for public entities, that full tort responsibility entails the risk of insolvency, or at least of intolerable tax burdens, in the event that a major catastrophe becomes the basis of liability. By providing a specific, albeit essentially arbitrary, basis for fiscal planning and acquisition of insurance coverage, dollar limits avoid the risk of calamitously high judgments.
>
> Unfortunately, the ideal of equal justice pays a high price for this contemplated fiscal security; it seems obvious that instances will arise in which the maximum damages allowable will bear no rational relationship to the actual damages sustained, and equally deserving claimants will receive grossly dispro-

---

**11.** Even this comment, however, acknowledges the necessity for a "residuum" of immunity "to satisfy the countervailing interests of the separation of powers, deterrence of harm, and victim compensation" that is "composed of true policy decisions, both necessary to govern and without private counterparts." Murray & Murray, at 121.

portionate awards. Indeed, the necessarily discriminatory consequences of statutory damage limits, under which some individuals injured by public employees will be treated less favorably than others for purely fortuitous reasons, suggests possible constitutional difficulties.... Moreover, experience suggests and legislative developments in other states confirm that adequate alternative ways for resolving the catastrophe judgment problem are readily available, that equal justice and fiscal stability need not be antagonistic objectives. In any event, the suggested rationale is in sharpest focus with respect to small public entities of limited fiscal resources; yet, paradoxically, in each of the states which have adopted damage limits, the statutes doing so are fully applicable to the very largest public entities possessing the broadest fiscal capabilities for risk distribution.

*Id.* at 971–72 (footnotes omitted); *see also* Spader, *Immunity v. Liability and the Clash of Fundamental Values: Ancient Mysteries Crying out for Understanding,* 6 Chi.[–]Kent L.Rev. 61 (1985).

In my view, section 63–30–3 and the recovery limits statutes, operating in conjunction, are unconstitutional. That view is concurred in by Justice Zimmerman. Justice Stewart's concurring opinion, although it agrees with this analysis of the interaction of the two statutes, opts to strike down only the damage cap provision, leaving section 63–30–3 intact. I think it would be preferable to strike both statutes, leaving the legislature free to restructure the immunity statutes as it sees fit.

### V. *Tort Liability and Deterrence*

The approach taken by the state in this case focuses on victims' rights to compensation and the public benefits to be acquired through limitations of those rights. We have already indicated that the restrictions embodied in the $100,000 recovery cap are an unjustified intrusion on constitutionally protected substantive rights to compensation for negligently inflicted injuries caused by health care providers not performing essential governmental func-

tions. We also believe that the balance struck by the legislature ignores the goal of deterrence:

The association of negligence with purely compensatory damages has prompted the erroneous impression that liability for negligence is intended solely as a device for compensation. Its economic function is different; it is to deter uneconomical accidents. As it happens, the right amount of deterrence is produced by compelling negligent injurers to make good the victim's losses. Were they forced to pay more (punitive damages), some economical accidents might also be deterred; were they permitted to pay less than compensation, some uneconomical accidents would not be deterred. It is thus essential that the defendant be made to pay damages and that they be equal to the plaintiff's loss. But that the damages are paid to the *plaintiff* is, from an economic standpoint, a detail.

R. Posner, *Economic Analysis of Law,* § 6.12, at 143 (1972) (footnote omitted).

Although deterrence-related concerns have been seen as problematic when applied against government entities, they have traditionally been viewed as central to influencing the behavior of medical professionals.

Underlying public policy goals or perceptions determine the balance between compensation and deterrence for any type of negligence liability. This balance is a variable which differs, depending on the particular activity or class of activity concerned.

. . . .

Many courts and commentators have puzzled over why such an anachronistic and unsupported concept as governmental immunity was so difficult to dissolve. The answer (or part of the answer), perhaps lies in what seems to be an identifiable, public policy undercurrent which suggests that governmental entities are less in need of deterrent incentives than are other classes of tortfeasors. This is because, while health care providers and other private sector actors operate in essentially an *economic marketplace,* gov-

ernmental bodies operate in a *political marketplace.* As such, adverse judgments through the tort process serve a more direct and important deterrent role in private sector decision-making than in the public sector.

    . . . .

If it can be accepted that governmental immunity persisted because of a *no need to deter* policy, then it is easier to understand why the obligation to compensate, by itself, was so slow in causing a shift in the balance between societal and individual interests. On the other hand, there has long been a recognized need for tort law deterrence among professionals generally, and among health care providers specifically.

Note, *Target Defendants and Tort Law Reform,* 11 Vt.L.Rev. at 567–68 (footnotes omitted).

The problem with Utah's Governmental Immunity Act is that it has created limited liability under the screen of governmental immunity for activities which were traditionally subject to the deterrent effects of tort liability. Furthermore, notwithstanding the fact that it is a government-owned health care facility, the University Hospital, in its patient care programs, virtually operates in the private sector, competing with other private, nonprofit entities, as well as with for-profit hospitals. In the area of patient service, it is not in the business of establishing government policy.[12] For that reason, the common law exception existed to prevent governmental immunity from barring medical malpractice actions in Utah, and for that reason, the deterrence factor in the balancing analysis this Court should apply weighs in favor of liability, not limitation.

In this balance, the public interest in limiting victims' rights must be weighed against the individual interest in compensation as well as the benefits accruing to a safer society through the general deterrence of harmful or negligent conduct. When the full scope of consideration is given, the legitimacy of various limita-

tions on rights or remedies can more accurately be measured.

Note, *Target Defendants and Tort Reform,* 11 Vt.L.Rev. at 566.

## VI. *Recovery Limitation and Right to a Jury Trial*

In *International Harvester Credit Corp. v. Pioneer Tractor and Implement, Inc.,* 626 P.2d 418 (Utah 1981), this Court held that the right of jury trial in civil cases is guaranteed by article I, section 10 of the Utah Constitution. An arbitrary limit on damages awarded by juries, in my view, seriously infringes upon that right:

The jury historically has been an integral part of the Anglo–American legal system. It would require the clearest language to sustain the conclusion that there was an intention to abolish an institution so deeply rooted in our basic democratic traditions and so important in the administration of justice, not only as a buffer between the state and the sovereign citizens of the state, but also as a means for rendering justice between citizens. We refuse to give a strained meaning to the terms of our Constitution which would result in dispensing with an institution that has the sanction of the centuries.

*International Harvester,* 626 P.2d at 420.

A recent federal district court case, *Boyd v. Bulala,* 672 F.Supp. 915 (W.D.Va.1987), contains a similar ruling as a matter of federal constitutional law in a diversity action for medical malpractice. The court's opinion summarized the history of the seventh amendment and concluded: "This necessarily foreshortened history of the seventh amendment thus reveals that the right to a civil jury trial was intended to serve as an important check upon the legislature and the judiciary." *Id.* at 919. The court examined a Virginia statute containing recovery caps in medical malpractice cases:

By limiting recovery in this way, the statute substantially diminishes the role of the jury in determining damages, *at*

---

**12.** *See* Eikenberry, *Governmental Tort Litigation and the Balance of Power,* 45 Pub.Admin.Rev. 742, 743 (1985) ("Something is fundamentally wrong with the idea that a tort action for damages is an appropriate way of setting or establishing governmental policy.").

*least in cases such as this, where the proven damages far exceed the amount of the cap.* Constitutional analysis must therefore focus on whether the seventh amendment guarantees the determination of damages by a jury, bearing in mind that the Supreme Court's admonition that "[m]aintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care."

672 F.Supp. at 919–20 (emphasis added) (quoting *Dimick v. Schiedt,* 293 U.S. 474, 486, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1935); *see also Kansas Malpractice Victims v. Bell,* 243 Kan. 333, 757 P.2d 251, 258–60 (1988).

Noting that the treatment of additur and remittitur under the seventh amendment "confirm[s] that the determination of damages is part of the 'substance of the common law right of trial by jury' " (quoting *Colgrove v. Battin,* 413 U.S. 149, 157, 93 S.Ct. 2448, 2453, 37 L.Ed.2d 522 (1973)), the *Boyd* court further observed:

> It is true that the Virginia General Assembly may constitutionally abolish a cause of action, and the attaching right to a jury trial. . . . It does not follow, however, that the legislature may constrict the right to a jury trial in the common-law actions which are retained. To the contrary, the seventh amendment commands that the right to trial by jury "shall be preserved." The legislature cannot, in the guise of shaping and delineating the cause of action, diminish this right.
>
> Likewise, the Commonwealth may not invoke the purpose of the statute to justify invading the province of the jury. . . . Though the legislature has broad power to regulate matters affecting public health and welfare, it may not infringe on a party's right to trial by jury in a federal court.

*Boyd,* 672 F.Supp. at 921.

I believe that the Utah state constitutional right to jury trial on the question of civil damages is absolute. I also believe that the absurdly low amount contained in the recovery limits statutes infringes egregiously on that right. Under the due process balancing analysis set forth in parts III and IV above, I would not hold that *any* limitation in actions against the government was *per se* invalid because of the infringement of the right to jury trial. However, in the case of a limitation which is on its face unlikely to cover even the medical expenses of plaintiffs, and in the absence of any evidence from the state justifying such an arbitrary limitation, I would strike the balance in favor of the constitutional guarantee of jury trial rather than the statute.

## VII. *Conclusion*

Only part of the foregoing analysis has been concurred in by Justices Zimmerman and Stewart, as explained in their separate opinions. Accordingly, the holding of the Court is limited to the following: the recovery limits statutes are unconstitutional as applied to University Hospital. The trial court's order is reversed, and this case is remanded for further proceedings consistent with this holding.

ZIMMERMAN, Justice (concurring in Part):

I join, in principle, parts III and IV of the opinion of Justice Durham. I write to elaborate my view on the due process issue. I express no opinion on the other points discussed in her opinion.

In *Berry,* this Court firmly staked itself out as finding substantive protections in article I, section 11's guarantee to "every person" of a "remedy by due course of law" for "an injury done to him [or her] in his [or her] person, property or reputation." Today's decision is a logical successor to *Berry.* It is true, as Justice Durham notes, that in *Berry* we chose not to describe as "fundamental" article I, section 11's guarantee. Maj. op. at 360; *Berry ex rel. Berry v. Beech Aircraft Corp.,* 717 P.2d 670, 677 (Utah 1985); Utah Const. art. I, § 11. However, in declining to so characterize the guarantee of a remedy of inju-

ries, I do not think we intended to denigrate the importance of the rights protected from legislative abridgment by article I, section 11. Instead, we simply avoided being bound into the analytical straitjacket that has been fashioned out of the federal equal protection clause for "fundamental" rights and the tempting parallel construction of the Utah Constitution's uniform-operation-of-the-laws provision. U.S. Const. amend. XIV, § 1; Utah Const. art. I, § 24; *cf.* Garfield, *Privacy, Abortion, and Judicial Review: Haunted by the Ghost of Lochner*, 61 Wash.L.Rev. 293, 345–46, 360 (1986) (reviewing the historical development of rigid forms of analysis dependent on the classification of rights as either fundamental or not fundamental); Note, *Lack of Statewide Equality in Court Delays Held Not a Denial of Equal Protection*, 1967 Utah L.Rev. 566 (advocating use of the "fundamental rights" straitjacket as a means to find an equal protection violation in a lack of statewide uniformity in court delay). In fact, I see little reason why the analytical framework used to test the constitutionality of legislation under article I, section 24 must ape the rigid two- (or three-) level analysis of the federal equal protection cases. *See, e.g., Mountain Fuel Supply Co. v. Salt Lake City Corp.*, 752 P.2d 884, 888–90 (Utah 1988). On this point, Justice Stewart and I appear to be in agreement. But there is no reason to consider that issue in great detail today because this case is properly analyzed under the due process balancing approach that *Berry* indicated is applicable when considering article I, section 11 questions.[1]

The present case has given me a better appreciation of the wisdom of including article I, section 11's guarantee in Utah's basic charter. The constitution's drafters understood that the normal political processes would not always protect the common law rights of all citizens to obtain remedies for injuries. *See Berry*, 717 P.2d at 676; *cf. Developments in the Law: The Interpretation of State Constitutional Rights*, 95 Harv.L.Rev. 1324, 1498–1502 (1982) (protection of majority from politically powerful minorities as an approach to state constitutional interpretation); Note, *State Economic Substantive Due Process: A Proposed Approach*, 88 Yale L.J. 1487, 1498 (1979) (perfunctory judicial review is inadequate to protect against special interest legislation). At any one time, only a small percentage of the citizenry will have recently been harmed and therefore will need to obtain a remedy from the members of any particular defendant class. The vast majority of the populace will have no interest in opposing legislative efforts to protect such a defendant class because the majority will not readily identify with those few persons unlucky enough to have been harmed. And those few persons directly affected will, in all likelihood, lack the political power to prevent the passage of legislation that, in essence, requires every member of the citizenry who is injured by members of the defendant class to bear some or all of the cost of those injuries.

Admittedly, the interests of a majority of the populace are commonly overridden in the legislative process, and, indeed, such

1. I cannot agree with the Chief Justice that due process-type balancing analysis is inappropriate here. Plaintiffs have certainly raised the article I, section 11 issue in this case by arguing that the legislation infringes rights protected by that provision. While plaintiffs may have phrased some portions of this argument in terms of equal protection concepts, we are certainly not limited to so analyzing the issue. *Berry* teaches that it is precisely due process concepts, rather than those of equal protection, that are involved when rights protected by article I, section 11 are claimed to have been abridged. 717 P.2d at 675–81. Therefore, it is appropriate for us to use due process analytical methods when treating such claims, whatever approach the parties may have taken to the issues.

Justice Stewart is at pains to renounce any suggestion of "substantive due process," apparently seeing in a balancing approach the spectre of a discredited era in Supreme Court jurisprudence. This concern is unjustified. *See, e.g.,* Garfield, *Privacy, Abortion, and Judicial Review: Haunted by the Ghost of Lochner*, 61 Wash.L. Rev. 293 (1986); Note, *State Economic Substantive Due Process: A Proposed Approach*, 88 Yale L.J. 1487 (1979). If there is any doubt that equal protection concepts can be and are used to produce the same results on essentially the same grounds as a more straight-forward due process analysis, those doubts should be dispelled by comparing Justice Stewart's separate opinion with mine.

overriding may be essential to the responsible operation of a representative deliberative body. However, the very act of drafting a constitution such as ours, which does not bestow unlimited power on the legislature and which does reserve certain rights to the people, constitutes a recognition that there must be some limits on the legislature, that some interests of the people deserve special protection in the maelstrom of interest group politics that is the legislative process. Among the interests to which the Utah Constitution's drafters assigned a degree of sanctity are those mentioned in article I, section 11.

To accord these rights the respect the drafters intended requires that we approach challenges to legislation alleged to infringe article I, section 11 differently than we otherwise view claims of unconstitutionality that are directed at ordinary economic legislation. Because the interests at stake are specifically protected by the constitution, the presumption of validity that normally attaches to legislative action must be reversed once it is shown that the enactment under scrutiny does, in fact, infringe upon the interests enumerated in article I, section 11. The burden then is upon the proponents of the legislation's validity to demonstrate that its restrictions on those rights are carefully drawn and supported by weighty considerations. *Cf.* Note, *supra,* 88 Yale L.J. at 1501–10 (proposing a method of review requiring the legislation's proponent to articulate the ends served by legislation and to bear the burden of proof of the nexus between means and ends). And in weighing the proffers of the legislation's defenders, we should not use as our analytical model the permissive and perfunctory standard of reasonable relation advocated by the appellees and the dissenters. Instead, we should give the legislation and its justifications careful scrutiny to assure that redress of legally cognizable injuries is not unreasonably impaired. *Cf., e.g., United States v. Carolene Products Co.,* 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938) (while adopting a perfunctory standard of review under the federal due process clause for economic regu-

lation in general, the Court explained that legislation impairing rights specifically protected by the federal constitution would require more careful review); *Pfost v. State,* 219 Mont. 206, 217–20, 713 P.2d 495, 502–03 (1985) (open courts provision makes the right to seek tort remedies a "fundamental interest" for purposes of equal protection analysis); *Ernest v. Faler,* 237 Kan. 125, 132, 697 P.2d 870, 875 (1985) ("[T]he right of a person injured by the tortious act of another to a remedy for his injuries is one of the basic constitutional rights."); *see also Estabrook v. American Hoist & Derrick, Inc.,* 127 N.H. 162, 171, 498 A.2d 741, 746 (1985), *overruled in part on other grounds, Young v. Prevue Products, Inc.,* 130 N.H. 84, 88, 534 A.2d 714, 717 (1987).

I do not suggest that we should strike down any such legislation if a less restrictive alternative is conceivable, as might be required by a "fundamental rights" equal protection analysis. Rather, I agree with the approach taken in *Berry* of weighing the particular infringement on the article I, section 11 interests at issue against the justifications offered for the restriction. *Berry,* 717 P.2d at 680, 683. This balancing process may not be as apparently neat and precise as the rigid equal protection classification tests that have developed under the federal constitution, but it is an approach better calculated to recognize the realities that a legislature must face in attempting to deal with perceived social and economic problems.

Returning to the present case, there can be no question that the legislation at issue, which severely restricts the right of every citizen to recover even actual out-of-pocket losses, both from a narrow category of health care providers who are the actual malefactors and from their governmental employer, substantially infringes upon those interests specifically protected by article I, section 11. *See Berry,* 717 P.2d at 676 & n. 3. For that reason, the burden of demonstrating the constitutionality of the statute shifts to its proponents. The supporters of the legislation have not carried their burden. The justifications advanced for the legislature's having abridged the

important right of citizens to recover even out-of-pocket losses occasioned by injuries to their persons in a narrow category of circumstances for the benefit of a narrow category of defendants are extraordinarily weak. In fact, at oral argument both the attorney general and the lawyer for the hospital and physicians involved admitted that they had no empirical evidence that damage awards in Utah have threatened the stability of any unit of government and that the concerns that led to the legislation were based on anecdotal evidence. *Cf. Pfost*, 713 P.2d at 503–05 (rejecting the Montana legislature's attempt to justify with speculative findings a cap on the tort liability of government entities).

In joining, in principle, parts III and IV of Justice Durham's opinion, I wish to avoid any implication her opinion may contain that flat caps on damages lacking any differentiation between actual and general or punitive damages may be constitutional. In my view, when the people are deprived of a right to recover actual out-of-pocket expenditures that have been or will be incurred because of the tortious conduct of another, the infringement upon the right to recover for harm to the person is far more severe and requires far more justification than when general damages for pain and suffering or punitive damages are restricted.

STEWART, Justice (Separate Opinion):

Plaintiffs raise only two issues, and both arise under the equal protection provisions of the United States and Utah constitutions. Those issues are:

1. Does the Legislature's abrogation of the common law right of action for negligence against employees of a governmentally owned health care facility violate constitutional provisions guaranteeing equal protection under the law?

2. Does the damage limitation provision of the Utah Governmental Immunity Act, when applied to a governmentally owned health care facility, violate the equal protection provisions of the Utah or United States Constitution?

In my view, Article I, section 24 of the Utah Constitution, the Utah equal protection provision, is dispositive because, unlike federal equal protection law, Utah law allows greater protection to individuals in cases of this type. *Malan v. Lewis*, 693 P.2d 661 (Utah 1984).

I agree with Justice Durham that the damages limitation is unconstitutional, but *only as applied to the University Hospital.* However, I do not agree with her legal analysis. First, I see no reason whatsoever to rely on a due process analysis, since it has not been raised. Furthermore, contrary to her view, there are real and important differences between equal protection and the Utah open courts clause analyses, and they are different from a due process analysis. *See Berry ex rel. v. Beech Aircraft Corp.*, 717 P.2d 670 (Utah 1985). Telescoping the due process, equal protection, and open courts analyses, as Justices Durham and Zimmerman do, blurs important analytical concepts intended to give different substance and effect to each constitutional provision and to the policies each is designed to serve. Justice Zimmerman fails to recognize that it is essentially equality before the law that equal protection principles further, and not the rationality of legislative ends and means as such.

Beyond all that, I believe that application of a substantive due process analysis is inappropriate. The era of federal substantive due process essentially ended shortly after *Nebbia v. New York*, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934). That era stands as the high water mark of an ill-fated and, I believe, illegitimate exercise of judicial power in the realm of legislative power. I strongly oppose any effort to put this Court on that track for a variety of reasons, including my view of separation of powers. Although substantive due process has not been wholly abandoned in some states, including Utah, it has by and large only been employed in cases of extreme arbitrariness, and this is not such a case.

Finally, I essentially agree with Chief Justice Hall's opinion as far as federal law is concerned. However, I believe he decides the damages limitation provision in a

manner contrary to the analytical framework adopted in *Malan v. Lewis*, 693 P.2d 661 (Utah 1984). For example, to presume the constitutionality of a statute when the statute deprives one of a right established by Article I, section 11 of the state constitution is to fail to give any greater weight to a constitutional right than to a nonconstitutional interest, such as a general social or economic interest. Furthermore, it is plain that *Malan* applies a higher standard of review than the minimal standard that the Chief Justice applies.

In sum, I conclude that the damage limitation in Utah Code Ann. § 63–30–34 [1] on tort recovery as applied to the University Hospital is unconstitutional. However, the ban on suits against government employees in their individual capacities is, in my view, constitutional. I reach these conclusions on the basis of Article I, section 24 of the Utah Constitution, the Utah equal protection provision.

## I. THE FACTS

Crelia Condemarin, plaintiff and appellant, entered Cottonwood Hospital during the early morning hours of May 19, 1982, after several hours of labor. Indications of a potential high-risk delivery, including a previous caesarean delivery, premature membrane rupture, and suspected prematurity, led her treating physician at Cottonwood to quickly transfer her to the University Hospital in Salt Lake City, where she was admitted at 5:45 a.m. by the resident on duty in the obstetrical unit, Dr. Gayle Carter. Condemarin, who spoke no English, was intermittently monitored for the next couple of hours by the hospital's medical staff. At 7:00 a.m., Carter went off

duty. At 8:05 a.m., Condemarin was prepared for an emergency caesarean section because fetal monitors indicated that the baby was being deprived of oxygen. Some minutes later, plaintiff Leonel Condemarin was born.

Attending physicians concluded that he had suffered fetal distress and was severely asphyxiated at birth. The asphyxia resulted in neurological damage including impairments of hearing and sight, seizure disorder, and spasticity. Leonel's current physician concluded that the child will have a normal life span as a severely retarded and handicapped individual. The physician further concluded that Leonel's physical and mental defects are related to the asphyxia at birth.

Plaintiffs initiated this action, alleging negligent treatment by the medical staff at the University Hospital. Each individual defendant was an employee of the University Hospital or the University of Utah. The action against Dr. R.M. Larkin, the attending physician in obstetrics at the time, has been dismissed. Plaintiffs moved for summary judgment in the trial court seeking to have portions of the Utah Governmental Immunity Act declared unconstitutional. The motion was denied by the trial judge, and this Court granted a petition for an interlocutory appeal.

## II. LIMITATION OF DAMAGES

The first issue I address is the constitutionality of the limitation on damages that may be awarded against a governmentally owned hospital for which immunity has been waived.[2] Sovereign immunity, the

---

1. At the time this lawsuit arose, Utah Code Ann. § 63–30–29 (1978) imposed a $100,000 limitation on the amount recoverable from a governmental entity. Section 63–30–34, in effect at that time, required a trial court to reduce a judgment against a governmental entity in excess of the limitation to the amount of the limitation or the policy limit of insurance secured by the entity, whichever was greater. These provisions were repealed in 1983 and replaced by the current provision set forth in footnote 2, *infra*. For convenience, I refer only to § 63–30–34 throughout this opinion. My

analysis, in any event, is the same under either the current statute or its predecessor.

2. Utah Code Ann. § 63–30–34 (Supp.1988) provides:

   (1) Except as provided in Subsection (3), if a judgment for damages for personal injury against a governmental entity, or an employee whom a governmental entity has a duty to indemnify, exceeds $250,000 for one person in any one occurrence, or $500,000 for two or more persons in any one occurrence, the court shall reduce the judgment to that amount, regardless of whether or not the

principle that the state cannot be sued in its own courts without its consent, was a well-settled principle of American common law when Utah became a state. *Madsen v. Borthick,* 658 P.2d 627, 629 (Utah 1983). In 1966, Utah enacted the Utah Governmental Immunity Act, § 63–30–1 to –38, which was intended to limit the harsh results produced by sovereign immunity, a doctrine that has continued to exist despite strong criticism. The central concept of the doctrine is that immunity should exist for governmental activities that are integral to the governing process so that they will not be jeopardized.

In *Greenhalgh v. Payson City,* 530 P.2d 799 (Utah 1975), this Court held that municipal ownership, maintenance, and operation of a hospital was a proprietary activity, and not a "governmental function" under § 63–30–3 of the Governmental Immunity Act as it then read, and that the city was not immune from liability for negligent injury.[3] The Court stated:

> A primary [factor to be considered] is whether the activity is something which is done for the general public good and which is generally regarded as a public responsibility. Coupled with this, other matters considered are whether there is any special pecuniary benefit to the City; and also, whether it is of such a nature as to be in competition with free enterprise.

530 P.2d at 801 (footnote omitted). The Court focused on the fact that since the hospital competed with others, its operation was a proprietary function. Subsequently, the Legislature amended § 63–30–3 specifically to exempt from liability governmentally owned hospitals, nursing homes, and other such health care facilities.[4]

In 1980, this Court decided *Standiford v. Salt Lake City Corp.,* 605 P.2d 1230 (Utah 1980), which provided a new analysis for deciding when governmental immunity should be applied to a governmental activity. The Court observed that the proprietary-governmental distinction is " 'one of the most unsatisfactory known to the law.' " *Id.* at 1233 (quoting Davis, *Administrative Law,* Ch. 9, "Tort Liability of Governments and of Officers," at 179). The Court concluded that reliance on the proprietary-governmental function distinction diverted the courts from the central concern—"namely, whether a governmental entity, like individuals and private entities, should be liable for an injury inflicted by it" as a matter of policy. *Id.* at 1234.

*Standiford* formulated the following test for determining whether governmental immunity applies: "whether the activity under consideration is of such a unique nature that it can only be performed by a governmental agency or that it is essential to the core of governmental activity." *Id.* at 1236–37. By restricting somewhat the scope of governmental immunity, the test implemented the legislative intent to allow "more innocent victims injured by tortious conduct on the part of public entities access to the courts for redress." *Id.* at 1237. Beyond that, the test articulates the core

---

function giving rise to the injury is characterized as governmental.

(2) Except as provided in Subsection (3), if a judgment for property damage against a governmental entity, or an employee whom a governmental entity has a duty to indemnify, exceeds $100,000 in any one occurrence, the court shall reduce the judgment to that amount, regardless of whether or not the function giving rise to the damage is characterized as governmental.

(3) The damage limits established in this section do not apply to damages awarded as compensation when a governmental entity has taken or damaged private property without just compensation.

3. At the time of the decision in *Greenhalgh,* § 63–30–3 read:

Except as may be otherwise provided in this act, all governmental entities shall be immune from suit for any injury which may result from the activities of said entities wherein said entity is engaged in the exercise and discharge of a governmental function.

4. Section 63–30–3 currently reads in part:

Except as may be otherwise provided in this chapter, all governmental entities are immune from suit for any injury which results from the exercise of a governmental function, governmentally-owned hospital, nursing home, or other governmental health care facility, and from an approved medical, nursing, or other professional health care clinical training program conducted in either public or private facilities.

value protected by governmental immunity—providing protection to the public treasury and tax revenues against overwhelming losses so that the essential functions of government will not be imperiled. The test also identifies where the constitutional right of a person to have a remedy for personal injury begins under Article I, section 11 of the Utah Constitution as against a governmental agency, and where the governmental right to immunity from such lawsuits stops.

The operation of the University Hospital is not a governmental function in the constitutional sense, although governmental operation of some community hospitals might, in my view, be a governmental function. There are a number of hospitals in the Salt Lake area, some of which are tertiary care hospitals, that compete with the University Hospital. The activities such hospitals perform need not be, and are not, performed only by a governmental agency; that is true even though the hospital is a teaching hospital. Privately owned hospitals also perform teaching functions.

*Frank v. State,* 613 P.2d 517 (Utah 1980), does not require a different conclusion. It held that the University Hospital performed a governmental function for purposes of determining applicability of the Immunity Act. The Court reached that conclusion by looking to the amendment to § 63–30–3 for guidance in resolving the immunity question, rather than applying the *Standiford* test. It must be noted, however, that the amendment does not declare that governmentally owned hospitals are *governmental functions;* rather, the amendment, using precise language, only declares governmentally owned health facilities *to be immune from suit* "except as otherwise provided" by the Immunity Act. Thus, the Legislature did not declare governmentally owned health facilities to be engaged in governmental functions,[5] and this Court's statement that the hospital was engaged in a *governmental function* mischaracterized the language of the statute. In any event, the statute cannot resolve a constitutional issue.

Thus, the issue that emerges is whether the Legislature ran afoul of Article I, section 24 of the Declaration of Rights of the Utah Constitution by limiting the liability of an institution owned by government which performs *nongovernmental* activities. Article I, section 24 states, "All laws of a general nature shall have uniform operation." It extends to every person the right to enjoy the equal protection of the law. The purpose of that provision, as explained in *Malan v. Lewis,* 693 P.2d at 669, is to assure that "persons similarly situated should be treated similarly, and persons in different circumstances should not be treated as if their circumstances were the same." "When persons are similarly situated, it is unconstitutional to single out one person or group of persons from among a larger class on the basis of a tenuous justification that has little or no merit." *Id.* at 671.

The first step in applying Article I, section 24 is to determine the appropriate standard of review for evaluating the lawfulness of the discriminatory classifications. Not all such classifications are unconstitutional. In *Malan,* we did not apply the three-tier test applied under federal equal protection law, but we did indicate that the strictness of our approach would vary with the nature of the right or interest discriminated against. 693 P.2d at 674 n. 17. The right involved here is the right to a full remedy for a personal injury, a right protected by Article I, section 11 of the Utah Constitution, which provides:

All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay. . . .

The term "remedy," as used in the open courts clause, means the full, fair, and complete remedy provided by the common law. *See Smith v. Department of Ins.,* 507 So.2d 1080 (Fla.1987); *Wright v. Central Du Page Hospital Assoc.,* 63 Ill.2d 313, 347 N.E.2d 736 (1976); *Kansas Malpractice*

5. *See* note 4 *supra.*

*Victims Coalition v. Bell,* 243 Kan. 333, 757 P.2d 251 (1988). *Cf. Kenyon v. Hammer,* 142 Ariz. 69, 688 P.2d 961 (1984) (en banc). *See generally Berry ex rel. v. Beech Aircraft Corp.,* 717 P.2d 670 (Utah 1985). Whether or not the right involved here is thought to be "fundamental," as the term is used under the Fourteenth Amendment, it is certainly an important right that ought not to be discriminatorily abrogated or diminished unless there is a strong countervailing public interest. *See Smith,* 507 So.2d at 1089.

Notwithstanding the importance of the right, I would not, and *Malan* did not, invoke the federal strict scrutiny standard. *See Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). While the least restrictive alternative test employed by the strict scrutiny standard focuses on a valid consideration in determining the constitutionality of a discriminatory statute, strict application of that test in cases such as this would hobble legislative power in an unreasonable fashion in an area where strong competing interests have to be accommodated by legislative policy making.

On the other hand, the Court in *Malan* also made clear that the great latitude allowed the Legislature in making classifications under the minimal scrutiny standard is not appropriate when a constitutional right is discriminated against. 693 P.2d at 671. Nor should the Court indulge highly speculative hypotheses as to a statute's purpose in applying the presumption of constitutionality. *See id. See also Allied Stores v. Bowers,* 358 U.S. 522, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *Baker v. Matheson,* 607 P.2d 233 (Utah 1979).

The appropriate standard, in my view, has more bite than the minimum scrutiny standard but does not purport to require the Legislature to find the least restrictive manner of furthering its purpose. But neither does it allow, on the other hand, such wide latitude as to virtually abandon judicial review. The statutory classifications must be reasonable, *Malan,* 693 P.2d at 672, and the statute that creates the classification must in fact reasonably and substantially further the legislative purpose. *See id.* at 673. The determination of reasonableness must take into account the extent to which the constitutional right—in this case the right to sue for a full recovery under Article I, section 11—is diminished and the extent to which the burden imposed actually furthers the legislative goals, as well as the importance of those goals.

The cap on liability imposed by § 63–30–34 creates at least two classes of hospital patients. One class consists of patients negligently injured at a governmentally owned hospital who are entitled to limited recovery, and another class is composed of patients negligently injured at a private institution who are entitled to full recovery. The critical issue is whether denying the constitutional right to some and not to others actually and substantially protects the public treasury from unreasonable depletion. Clearly, it is not the purpose of the Governmental Immunity Act to prohibit all public expenditures for governmental tort liability, and in fact, the Act does not do so. Moreover, there is no basis for concluding that according patients at the University Hospital a full remedy for tort liability will threaten the financial stability of government or of the hospital, or even result in an undue drain on resources. While there will be some additional expenditures incurred by the hospital's liability for full damages, there is no reason to believe that that cost cannot be covered as present liabilities.

The University Hospital is a teaching hospital associated with the University of Utah School of Medicine and it is essentially supported by non-state funds. The affidavit of Dale Gunnell, the associate administrator of the hospital, filed with the Attorney General's memorandum in opposition to plaintiffs' motion for partial summary judgment, discloses that of a total operating budget of $80,000,000 (apparently for the year 1984), only 3.5 percent of the hospital's operating budget came from legislative appropriations. The legislation

which authorized construction of the University of Utah Medical Center provided only $1.5 million of the cost of construction, while $4 million came from "private subscriptions and contributions." *See* Utah Code Ann. § 53–31–46 (1981). The affidavit states: "This level of funding is exceptionally low for a University-based teaching hospital, and the hospital is, practically, self-supporting." Although it is true that students at the University of Utah School of Medicine receive some of their training at the University Hospital, they also receive training at other private hospitals. The University Hospital competes directly with other hospitals that are not subject to a limitation on tort recovery and therefore must stand the expense, either through insurance or otherwise, of full legal liability for damages negligently caused to patients. The patient pays for hospital services rendered in each instance; the burden of unrecompensable injuries is the same to both types of patient; and in this case the financial burden to the University Hospital and the financial burden to the private hospital for negligent actions is the same.

There is no reason to conclude that the University Hospital would have any more difficulty in assuming those costs than the other major hospitals in Salt Lake City and its environs. Perhaps those costs will ultimately be passed on to the patients patronizing the hospital and their insurance companies, as occurs with other hospitals. Neither the hospital nor the Attorney General in this case even begins to demonstrate that requiring the hospital to shoulder the full cost of liability will have a substantial effect on the state's treasury. There is no evidence that in Utah personal injury judgments are unduly large or that they have increased greatly in their number. Indeed, since the government bears only a fraction of the total cost of the operation of the entity, it is clear that the vast bulk of the activity is self-financed by fees and charges.

In sum, the damage limitation, which operates *only* on those most seriously and severely injured, is an intrusion on a constitutional right that is not justified by whatever marginal enhancement of the legisla-tive purpose flows from the statute. *See Malan*, 693 P.2d at 673. That conclusion is supported by a number of cases from other jurisdictions. *See Coburn v. Agustin*, 627 F.Supp. 983, 991–96 (D.Kan.1985); *Jones v. State Bd. of Medicine*, 97 Idaho 859, 871, 555 P.2d 399, 411 (1976), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977); *Farley v. Engelken*, 241 Kan. 663, 672, 740 P.2d 1058, 1064–65 (1987); *Sibley v. Board of Supervisors of La. State Univ.*, 477 So.2d 1094, 1107–09 (La.1985); *Carson v. Maurer*, 120 N.H. 925, 932, 424 A.2d 825, 830 (1980); *Arneson v. Olson*, 270 N.W.2d 125, 135–36 (N.D.1978).

For the foregoing reasons, I conclude that § 63–30–34 is unconstitutional as it applies to the University Hospital because it violates Article I, section 24 of the Utah Constitution. Whether that section may be constitutional as applied to municipal hospitals and other health care facilities is a question I leave for another day.

### III. SUITS AGAINST EMPLOYEES

Plaintiffs also complain that they are deprived of their right to sue University Hospital employees, including doctors and nurses, under the Utah open courts provision. *See Berry ex rel. v. Beech Aircraft Corp.*, 717 P.2d 670 (Utah 1985). The argument here is that at common law plaintiffs could sue the hospital employees in their individual capacities, but they are prevented from doing that under the amendments to the Immunity Act. Plaintiffs also argue that the deprivation constitutes a denial of equal protection of the laws.

At the outset, it should be noted that although plaintiffs have been deprived of a remedy against the doctors and nurses individually, they do have a full remedy against the hospital. In *Berry*, we stated that Article I, section 11 was not violated if "the law provides an injured person an effective and reasonable alternative remedy...." 717 P.2d at 680. In *Payne v. Myers*, 743 P.2d 186 (Utah 1987), this Court held that the amendment to § 63–30–4 did not violate Article I, section 11 because of

the remedy the plaintiffs had against the hospital.

That conclusion means that the discriminatory aspect of § 63–30–4 does not deny a constitutional right under Article I, section 11 and, therefore, the standard of review under the equal protection analysis is less stringent than the standard applied to the cap on damages. The validity of the discrimination made by § 63–30–4 turns on whether the classification is arbitrary in light of the presumed purposes of the statute. Since the hospital is primarily a teaching hospital, it is, in my view, reasonable to shift liability from the employees of the institution so as to protect them and, in effect, require the institution to assume the full liability, where it almost invariably ends up anyway. In my view, therefore, § 63–30–4 is not unconstitutional.

HALL, Chief Justice (dissenting):

I do not join the Court in departing from the traditional rational basis standard of review in assessing the constitutionality of the Utah Governmental Immunity Act.

The issues presented which are dispositive of this appeal are (1) whether the equal protection guarantees of the Utah and United States Constitutions are violated by provisions of the Utah Governmental Immunity Act which place a limitation upon the amount that can be recovered from a governmental entity; and (2) whether the equal protection guarantees of the Utah and United States Constitutions are violated by provisions of the Utah Governmental Immunity Act which restrict individual suits against governmental employees.

Relevant sections of the Utah Governmental Immunity Act provide:

Section 63–30–3. Immunity of governmental entities from suit.—Except as may be otherwise provided in this act, all governmental entities are immune from suit for any injury which results from the exercise of a governmental function, governmentally-owned hospital, nursing home, or other governmental health care facility, and from an approved medical, nursing, or other professional health care clinical training program conducted in either public or private facilities.

Section 63–30–4.... Limitations on personal liability....

The remedy against a governmental entity or its employee for an injury caused by an act or omission which occurs during the performance of such employee's duties, within the scope of employment, or under color of authority is, after the effective date of this act, exclusive of any other civil action or proceeding by reason of the same subject matter against the employee or the estate of the employee whose act or omission gave rise to the claim, unless the employee acted or failed to act through gross negligence, fraud or malice.

An employee may be joined in an action against a governmental entity in a representative capacity if the act or omission complained of is one for which the governmental entity may be liable, but no employee may be held personally liable for acts or omissions occurring during the performance of the employee's duties, within the scope of employment or under color of authority, unless it is established that the employee acted or failed to act due to gross negligence, fraud or malice.

Section 63–30–34. Liability Insurance–Judgment or award over limits of insurance policy reduced-limitation of judgment or award against self-insurers. —If any judgment or award against a governmental entity under sections 63–30–7, 63–30–8, 63–30–9, and 63–30–10, or against a governmental employee for which a governmental entity may have a statutory duty to indemnify the employee, exceeds the minimum amounts for bodily injury and property damage liability specified in section 63–30–29, the court shall reduce the amount of the judgment or award to a sum equal to the minimum requirements unless the governmental entity has secured insurance coverage in excess of said minimum requirements in which event the court shall reduce the amount of the judgment or award to a sum equal to the applicable limits provided in the insurance policy.

Any governmental entity that acts as a self-insurer under section 63–30–28 is liable for any judgment or award entered against it or its employee under sections 63–30–7, 63–30–8, 63–30–9, and 63–30–10, and is liable to indemnify its employees against personal liability in accordance with sections 63–48–1 through 63–48–7, but only to the extent of the minimum amounts for bodily injury and property damage liability specified in section 63–30–29, and no judgment or award shall be entered in such action in excess of such minimum amounts.[1]

Plaintiffs argue that these provisions, as they apply to this action, violate constitutional guarantees of equal protection by classifying similarly situated people differently. As to the damage limitation issue, plaintiffs essentially contend that the Governmental Immunity Act violates the equal protection clauses because of the following four types of alleged discrimination.

(1) The statutes discriminate between malpractice victims of public versus private hospitals by limiting the former to judgments not exceeding a statutory amount, while allowing the latter full recovery for negligently inflicted damages.

(2) Individuals injured by governmental entities performing "nonessential" governmental functions are entitled to unlimited recovery, whereas individuals injured by governmental health care providers are subject to the statutory limit.

(3) Victims of governmentally owned hospitals are classified by whether the hospital purchased insurance or is self-insured.

Judgment against self-insured governmental hospitals is limited to the statutory amount, while judgment against insured governmental hospitals is only limited by the amount of the purchased insurance policy.

(4) Finally, victims of governmental tortfeasors are classified according to the severity of their injuries. Victims may recover only up to the statutory limit; this allows victims with less serious injuries to possibly recover in full, while seriously injured victims are discriminately denied recovery for injuries exceeding the statutory limit.

As to the statutory proscription against suing governmental employees performing governmental functions, plaintiffs contend that the Act violates equal protection guarantees because patients who are treated by employees at private hospitals may bring an action against those employees for injuries incurred as a result of their negligence. A patient who is injured by the negligence of employees of the University Hospital, however, may not recover anything from those employees personally unless gross negligence, fraud, or malice is found.

The foregoing contentions need to be addressed in light of the legal principle that legislative acts are presumed constitutional[2] and that a heavy burden necessarily rests on the party challenging the legislative action on constitutional grounds.[3] Therefore, if any doubt exists, it must be resolved in favor of the constitutionality of the statute(s).[4]

1. Utah Code Ann. §§ 63–30–3 (Interim Supp. 1981) (amended 1984 & 1985), –4 (Supp.1979) (amended 1983), –34 (Supp.1979) (repealed and reenacted 1983; amended 1987).

2. *Timpanogos Planning & Water Management Agency v. Central Utah Water Conservancy Dist.,* 690 P.2d 562, 564 (Utah 1984); *State v. Murphy,* 674 P.2d 1220, 1222 (Utah 1983); *Dague v. Piper Aircraft Corp.,* 275 Ind. 520, 530, 418 N.E.2d 207, 213–14 (1981); *Sambs v. City of Brookfield,* 97 Wis.2d 356, 370, 293 N.W.2d 504, 511, *cert. denied,* 449 U.S. 1035, 101 S.Ct. 611, 66 L.Ed.2d 497 (1980).

3. *Salt Lake City v. Savage,* 541 P.2d 1035, 1037 (Utah 1975), *cert. denied,* 425 U.S. 915, 96 S.Ct. 1514, 47 L.Ed.2d 766 (1976); *Trade Comm'n v.*

*Skaggs Drug Centers, Inc.,* 21 Utah 2d 431, 438, 446 P.2d 958, 962 (1968). Courts in other jurisdictions have similarly held. *See, e.g., Johnson v. St. Vincent Hosp., Inc.,* 273 Ind. 374, 381, 404 N.E.2d 585, 591 (1980); *Winston v. Reorganized School Dist.,* 636 S.W.2d 324, 327 (Mo.1982) (en banc); *Sambs,* 97 Wis.2d at 370, 293 N.W.2d at 511; *Stephenson v. Mitchell ex rel. Workmen's Compensation Dep't,* 569 P.2d 95, 97 (Wyo.1977).

4. *Dague,* 275 Ind. at 530, 418 N.E.2d at 213; *Winston,* 636 S.W.2d at 327; *Americans United v. Rogers,* 538 S.W.2d 711, 716, 721 (Mo.) (en banc), *cert. denied,* 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976); *Sambs,* 97 Wis.2d at 370, 293 N.W.2d at 511; *Stanhope v. Brown County,* 90 Wis.2d 823, 837, 280 N.W.2d 711, 716 (1979).

In this regard, it is not the prerogative of the Court to nullify a legislative enactment unless there is a clear, complete, and unmistakable violation of some specific provision of the constitution.[5] Indeed, it is the Court's duty to investigate and, insofar as possible, construe the challenged legislation so as to discover any reasonable avenues by which the statute(s) can be upheld,[6] allowing every reasonable presumption in favor of constitutionality.[7] Furthermore, it is not our prerogative to question the wisdom, social desirability, or public policy underlying a given statute. Those are matters left exclusively to the legislature's judgment and determination.[8] And when a challenger asserts that a statutory classification violates the equal protection clause, he or she must prove abuse of legislative discretion beyond a reasonable doubt.[9]

Regarding the principle of prudent judicial restraint, the United States Supreme Court has stated:

[I]t has always been a matter of fundamental principle with this Court, a principle dictated by our very institutional nature and constitutional obligations, that we exercise our powers of judicial review only as a matter of necessity. As said in *United States v. Petrillo*, 332 U.S. 1, 5 [67 S.Ct. 1538, 1540, 91 L.Ed. 1877] (1947), "We have consistently refrained from passing on the constitutionality of a statute until a case involving it has reached a stage where the decision of a precise constitutional issue is a necessity." [10]

This principle, that we necessarily avoid addressing and striking down statutes pursuant to constitutional grounds, especially those not urged by the parties, honors the doctrine of separation of powers of our three branches of government and exists notwithstanding the conviction of mind or the personal desires of this Court or its justices to determine policy or rectify perceived wrong.[11]

5. *Sims v. Smith*, 571 P.2d 586, 587 (Utah 1977) (quoting *Pride Club Inc. v. State*, 25 Utah 2d 333, 481 P.2d 669 (1971)); *Utah Farm Bureau Ins. Co. v. Utah Ins. Guar. Ass'n*, 564 P.2d 751, 753 (Utah 1977).

6. *See State v. Lindquist*, 674 P.2d 1234, 1237 (Utah 1983); *State v. Casarez*, 656 P.2d 1005, 1008 (Utah 1982); *State v. Wood*, 648 P.2d 71, 82 (Utah), *cert. denied*, 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982); *In re Boyer*, 636 P.2d 1085, 1088 (Utah 1981).

7. *Zamora v. Draper*, 635 P.2d 78, 80 (Utah 1981); *Trade Comm'n*, 21 Utah 2d at 437–38, 446 P.2d at 962; *Winston*, 636 S.W.2d at 327–28. Indeed, where persons are treated differently under legislation which is basically economic in nature, we have held that such legislation is entitled to a presumption of constitutionality and such presumption may justify discriminations, even without actual evidence demonstrating a rational basis for the distinctions made. *See Baker v. Matheson*, 607 P.2d 233, 236, 244 (Utah 1979).

8. *Winston*, 636 S.W.2d at 327; *Masich v. United States Smelting, Ref. & Mining Co.*, 113 Utah 101, 126–27, 191 P.2d 612, 625, *appeal dismissed*, 335 U.S. 866, 69 S.Ct. 138, 93 L.Ed. 411 (1948), *reh'g denied*, 325 U.S. 905, 69 S.Ct. 405, 93 L.Ed. 439 (1949); *see also City of New Orleans v. Dukes*, 427 U.S. 297, 303–04, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976), *quoted in Short v. Texaco, Inc.*, 273 Ind. 518, 528–29, 406 N.E.2d 625, 632 (1980), *aff'd*, 454 U.S. 516, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982); *Sidle v. Majors*, 264 Ind. 206, 209, 341 N.E.2d 763, 766 (1976);

*Brown v. Wichita State Univ.*, 219 Kan. 2, 13, 547 P.2d 1015, 1025 (quoting *Tri–State Hotel Co. v. Londerholm*, 195 Kan. 748, 760, 408 P.2d 877, 887 (1965), *appeal dismissed*, 429 U.S. 806, 97 S.Ct. 41, 50 L.Ed.2d 67 (1976).

9. *Utah Pub. Employees' Ass'n v. State*, 610 P.2d 1272, 1274 (Utah 1980) (quoting *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911)); *Sambs*, 97 Wis.2d at 370, 293 N.W.2d at 511.

10. *Sanks v. Georgia*, 401 U.S. 144, 151, 91 S.Ct. 593, 597, 27 L.Ed.2d 741 (1971), *quoted in Gray v. Dep't of Employment Sec.*, 681 P.2d 807, 824 (Utah 1984) (Durham, J., concurring and dissenting).

11. *Stone v. Dep't of Registration*, 567 P.2d 1115, 1117 (Utah 1977); *cf. Wood*, 648 P.2d at 82 ("It is a fundamental rule that we should avoid addressing a constitutional issue unless required to do so.") (citations omitted); *Peck v. Dunn*, 574 P.2d 367, 369 (Utah) ("[I]f there is a choice as to the matter of ... [a statute's] interpretation and application, that should be done in a manner which will make it constitutional, as opposed to one which would make it invalid."), *cert. denied*, 436 U.S. 927, 98 S.Ct. 2822, 56 L.Ed.2d 770 (1978); *Brown*, 547 P.2d at 1023, 1030–31 ("As judges our desire to achieve what may seem fair to us as individuals cannot overcome the laws enacted by our duly elected legislators." "There was a time when the courts used the Fourteenth Amend-

Acknowledging these established concepts, I am not convinced that the "performance of . . . [a] balancing function under the due process framework" [12] is appropriate or required as "a matter of necessity" in this case.[13] Indeed, the question presented for our determination, as conceded in the main opinion, is whether the legislation in question impermissibly affected plaintiffs' rights to equal protection of the law. Notwithstanding any "overlap" between the analyses of claims brought pursuant to equal protection and due process rights, (1) plaintiffs have not challenged the validity of the subject statutes under the open courts provision or the due process clause;[14] (2) the parties have neither urged nor addressed the applicability and appropriateness of discarding established principles of equal protection review in favor of the main opinion's "due process balancing test";[15] (3) consideration pursuant to a "due process balancing" analysis has not been likewise "forced" into other applicable cases addressing similar issues and constitutional provisions; (4) significant distinctions between the relevant constitutional principles and analyses pursuant thereto have not been acknowledged or addressed by the main opinion; and (5) broad application of the "due process balancing

test" has not been explained, tempered, or distinguished by the main opinion from other claims and cases involving noneconomic legislation, equal protection, and the right to recover for personal injuries. Instead, convinced that "[c]haracterizing plaintiffs' rights here as 'nonfundamental' would virtually insure that the legislative action will be found constitutional under the [equal protection] rational basis standard," [16] the main opinion fashions and imposes a due process analysis in order to challenge the subject legislation. In doing so, it ignores established principles of judicial review [17] to reach a desired result.

Further, the use of a rational basis standard in measuring statutes limiting or barring governmental liability does not, as the main opinion implies, inevitably result in a finding that the legislation is constitutional. Indeed, in *Ryszkiewicz v. City of New Britain*,[18] the Connecticut Supreme Court, in reviewing an action against the state to recover damages for injuries sustained in a fall, applied the test followed by "the vast majority of courts" considering governmental immunity statutes [19] and concluded that there was no rational basis behind imposing a liability limit in damages for all torts

ment due process clause to strike down laws thought to be unwise. Since then courts have returned to the original concept of constitutional interpretation, that courts do not substitute their social and economic beliefs for the judgment of legislative bodies whose function it is to pass the laws. The court has been cited to no case where constitutional due process has been used as a basis for the abrogation of legislatively imposed governmental immunity." (Citations omitted.)).

**12.** Main opinion at 357; *see also id.* at 356.

**13.** *See Sanks,* 401 U.S. at 151, 91 S.Ct. at 597.

**14.** *See Berry ex rel. Berry v. Beech Aircraft,* 717 P.2d 670, 674–86 (Utah 1985); *cf. Madsen v. Borthick,* 658 P.2d 627, 629 (Utah 1983) ("Article I, § 11 of the Utah Constitution . . . was not meant to create a new legal remedy or a new right of action. Consequently, Article I, § 11 worked no change in the principle of sovereign immunity, and sovereign immunity is not unconstitutional under that section.") (citing *Brown v. Wightman,* 47 Utah 31, 34, 151 P. 366, 366–67 (1915) ("[W]here no right of action is

given, however, or no remedy exists, under either the common law or statute, . . . [Article I, § 11] create[s] none." Courts protect and enforce existing rights only in accordance with established and known remedies.)); *Robson v. Penn Hills School Dist.,* 63 Pa.Cmwlth. 250, 256, 437 A.2d 1273, 1276 (1981) (nothing in open courts clause of constitution prevents legislature from extinguishing cause of action).

**15.** *See Yotvat v. Roth,* 95 Wis.2d 357, 372, 290 N.W.2d 524, 532 (Wis.Ct.App.1980) ("The question of the rights of governmental tort victims is a difficult one, and legislation in that area should not be overturned without complete briefing by the parties."), *superseded by statute as stated in Daily v. Univ. of Wis., Whitewater,* 145 Wis.2d 756, 429 N.W.2d 83 (Wis.Ct.App.), *review denied,* 436 N.W.2d 30 (Wis.1988).

**16.** Main opinion at 357, 358.

**17.** *See supra* notes 2–11 and accompanying text.

**18.** 193 Conn. 589, 479 A.2d 793 (1984).

**19.** *Id.* 193 Conn. at 598, 479 A.2d at 799, and cases cited therein.

that occur in New Britain.[20] In holding such, that court cited decisions by the Alabama and Kansas Supreme Courts supporting the conclusion that immunity legislation, when measured by the rational basis test, nonetheless denied the plaintiffs their constitutional rights to equal protection of the law.[21]

Regardless, the concern expressed in the main opinion that the legislation before us is constitutional under a rational basis approach does not justify its claim "[t]hat balancing should be accomplished by means of a due process, rather than an equal protection, analysis."[22] Accordingly, recognizing that we are compelled by the specific issue raised here, relevant case law, and the fundamentals of judicial review to consider and analyze the legislation's constitutionality only in regard to the following established equal protection principles, I dissent from the views expressed in the main opinion.[23]

The Utah Governmental Immunity Act sets forth the type of losses for which it permits recovery and places a limitation on the amount of recovery allowed.[24] Plaintiffs contend, therefore, that some victims have greater rights than others. The mere exclusion of persons situated as plaintiffs from the classes of victims entitled to recovery, however, does not alone render the legislative scheme invalid.[25] Rather, article I, section 24 of the Utah Constitution states: "All laws of a general nature shall have uniform operation." The fourteenth amendment of the United States Constitution similarly prohibits states from enacting laws that deny "any person within its jurisdiction equal protection of the laws."[26] Although the language of these two provisions is dissimilar, both embody the general principle that "persons similarly situated should be treated similarly, and persons in different circumstances should not be treated as if their circumstances were the same."[27]

As we stated in *Malan v. Lewis*, although article I, section 24 of the Utah Constitution embodies the same general principles incorporated in the equal protection clause of the United States Constitution, construction and application of our state constitutional provision is not controlled by the federal court's construction and application of the federal equal protection clause. While case law developed under the fourteenth amendment may be persuasive in applying article I, section 24, such law is not binding on the state as long as we do not reach a result that violates the federal equal protection clause.[28] Notwithstanding comments of my colleagues to the contrary, for purposes of this analysis, no conflict exists between the standard of review utilized by this Court and that used by federal courts.[29] Therefore, both state and federal cases will be cited as to

20. *Id.* 193 Conn. at 598–600, 479 A.2d at 799–801.

21. *Id.* 193 Conn. at 599, 479 A.2d at 800 (citing *Peddycoart v. City of Birmingham*, 354 So.2d 808 (Ala.1978); *Flax v. Kansas Turnpike Auth.*, 226 Kan. 1, 596 P.2d 446 (1979) (apparent use of rational basis test)).

22. Main opinion at 356 (footnote omitted).

23. Even if I were to ignore the principles noted above and agree with the main opinion that a due process "balancing analysis" is acceptable in this case, I would not concur with the determinations that such analysis favors liability or that the damage limitation provisions are unconstitutional.

24. While the amount of recovery under the challenged statutes was limited to $100,000 per person and $300,000 for two or more persons, *see* Utah Code Ann. §§ 63–30–29, –34 (Supp.1979), Utah Code Ann. §§ 63–30–29 and –34 were repealed and the latter section reenacted in 1983. That section now limits recovery resulting from personal injury to $250,000 per person and $500,000 for two or more persons. Utah Code Ann. § 63–30–34 (Supp.1988).

25. *Child v. City of Spanish Fork*, 538 P.2d 184, 187 (Utah 1975); *Parham v. Hughes*, 441 U.S. 347, 351, 99 S.Ct. 1742, 1745, 60 L.Ed.2d 269 (1979); *McGowan v. Maryland*, 366 U.S. 420, 425, 81 S.Ct. 1101, 1104, 6 L.Ed.2d 393 (1961); *Winston*, 636 S.W.2d at 327–28.

26. *Malan v. Lewis*, 693 P.2d 661, 669 (Utah 1984).

27. *Id.* (footnote & citations omitted).

28. *Id.* at 670 (citations omitted).

29. *See supra* notes 2–11 and accompanying text; *see also infra* note 57.

each test, and no attempt will be made to differentiate between state and federal equal protection arguments.

In analyzing a statute's constitutionality under article I, section 24, we consider whether the law meets the criteria of applying equally to all persons within a class.[30] In order for a classification (or different treatment within a class) to be valid under Utah's equal protection standard, such classification must be reasonable and not arbitrary [31] and must be based upon differences that further the statutory objective.[32] Depending upon the importance of the interest involved, the state will have a greater or lesser burden to show this relationship.[33] This, then, establishes the framework for the necessary analysis. With respect to the specific provisions before this Court, it is necessary to determine at the outset the proper standard of review, namely, whether the challenged provisions of the Governmental Immunity Act operate to the disadvantage of a suspect class or impinge upon a fundamental right protected by the constitution such that the state would need to demonstrate a compelling interest in the subject matter of the statute in order to justify the resulting discrimination or, in the alternative, whether the provisions merit intermediate review or, lastly, rationally further some legitimate state purpose, therefore not constituting an invidious discrimination in violation of the equal protection guarantees of the Utah and United States Constitutions.[34] Although the Utah Governmental Immunity Act establishes several classifications, none of the statutory demarcations plaintiffs focus upon involve the type of suspect classification, such as race, nationality, or alienage, determined by the United States Supreme Court to require strict scrutiny analysis.[35] Furthermore, the Supreme Court has firmly reiterated the principle that "equal protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." [36]

In regard to rights classified as "fundamental," this Court has stated the standard as follows:

The catalog of fundamental interests is relatively small to date, and includes such things as the right to vote, to pro-

**30.** *State Tax Comm'n v. Department of Fin.*, 576 P.2d 1297, 1298 (Utah 1978); *Dodge Town v. Romney*, 25 Utah 2d 267, 269, 480 P.2d 461, 462 (1971).

**31.** *Hart Health Studio v. Salt Lake County*, 577 P.2d 116, 118–19 (Utah 1978); *Loving v. Virginia*, 388 U.S. 1, 10, 87 S.Ct. 1817, 1822, 18 L.Ed.2d 1010 (1967); *Wilson v. Municipality of Anchorage*, 669 P.2d 569, 572 (Alaska 1983).

**32.** *Thompson v. Salt Lake City Corp.*, 724 P.2d 958, 959 (Utah 1986); *State v. Bishop*, 717 P.2d 261, 266 (Utah 1986).

**33.** *See, e.g., Wilson*, 669 P.2d at 572.

**34.** *See generally J.J.N.P. Co. v. State ex rel. Div. of Wildlife Resources*, 655 P.2d 1133, 1137 (Utah 1982).

**35.** *See, e.g., Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 n. 4, 96 S.Ct. 2562, 2566 n. 4, 49 L.Ed.2d 520 (1976) (per curiam); *Loving*, 388 U.S. at 8–9, 87 S.Ct. at 1821–1822; *Carson v. Maurer*, 120 N.H. 925, 938, 424 A.2d 825, 830 (1980) (medical malpractice legislation), and cases cited therein, *limited by Appeal of Bosselait*, 130 N.H. 604, 547 A.2d 682 (1988). As was the case in *Troyer v. Wyoming Department of Health and Social Services*, 722 P.2d 158 (Wyo. 1986), plaintiffs herein have not alleged that the Utah Governmental Immunity Act discriminates against a suspect class. However, as noted in *Troyer*, there are no classifications in this Act based upon plaintiffs' characteristics. The provisions of the Act apply equally to every person suffering injury by the state, and there is no suspect classification triggering compelling state interest analysis. *Troyer*, 722 P.2d at 165 n. 3; *see also infra* note 42 and accompanying text.

**36.** *Murgia*, 427 U.S. at 312, 96 S.Ct. at 2566 (footnotes omitted) (citing *San Antonio School Dist. v. Rodriguez*, 411 U.S. 1, 16, 93 S.Ct. 1278, 1287, 36 L.Ed.2d 16, *reh'g denied*, 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973)). Moreover, the rights classified as "fundamental" by the Supreme Court have been few in number. While the Supreme Court has offered little guidance as to the characteristics of a fundamental right, rights such as privacy, marriage, procreation, travel and voting and first amendment rights have been classified as "fundamental" and extended to a strict scrutiny review. *Murgia*, 427 U.S. at 312 n. 3, 96 S.Ct. at 2566 n. 3, and cases cited therein; 16A Am.Jur.2d *Constitutional Law* § 750, at 819–20 and cases cited therein.

create and to travel interstate.... A right or interest does not invoke strict scrutiny just because it is important to the aggrieved party. Only those rights which form an implicit part of the life of a free citizen in a free society can be called fundamental.[4]

4. The United States Supreme Court has referred to such rights as "implicit in the concept of ordered liberty."[37]

Plaintiffs essentially assert that the right to bring a civil action for personal injuries and the right to full legal redress are fundamental rights guaranteed under article I, section 11 of the Utah Constitution. Therefore, plaintiffs contend that the constitutionality of the Governmental Immunity Act's provisions allegedly abrogating or constricting those rights must be judged by the more burdensome strict scrutiny test. Article I, section 11 provides:

All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay; and no person shall be barred from prosecuting or defending

37. *Utah Public Employees' Ass'n,* 610 P.2d at 1273 (quoting in footnote *Palko v. Connecticut,* 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937), *overruled on other grounds, Benton v. Maryland,* 395 U.S. 784, 793–94, 89 S.Ct. 2056, 2061–62, 23 L.Ed.2d 707 (1969)).

38. 203 Mont. 363, 661 P.2d 1272 (1983).

39. *Id.* 203 Mont. at 365, 661 P.2d at 1275. *White v. State* and the subsequent case of *Pfost v. State,* 219 Mont. 206, 713 P.2d 495 (Mont.1985), are easily distinguished. During the reformation and readoption of a new Montana constitution in 1972, the constitutional framers "swept aside all notions of governmental immunity." *Pfost,* 219 Mont. at 209, 713 P.2d at 499. Therefore, later statutory attempts to reinstate limited governmental immunity in Montana were apparently considered an unconstitutional invasion upon the right to sue governmental entities for full legal redress. *Id.* 219 Mont. at 211–218, 713 P.2d at 505–06. In contrast, the adoption of the Utah Constitution, including the open courts provision of article I, section 11, worked no change in the already existing principle of sovereign immunity. *See Madsen,* 658 P.2d at 629; *see also Ryszkiewicz,* 193 Conn. at 598, 479 A.2d at 799; *Troyer,* 722 P.2d at 165 (right to sue particular individual is not fundamental).

before any tribunal in this State, by himself or counsel, any civil cause to which he is a party.

In support of their proposition, plaintiffs cite the Montana case of *White v. State.*[38] Therein, the plaintiffs challenged a Montana statute barring recovery of noneconomic damages and limiting recovery of economic damages in a suit against the state. The Montana Supreme Court declared that the right to bring a cause of action for personal injuries was fundamental and that the statutory classification scheme had to thus satisfy a compelling state interest.[39]

I disagree with the Montana court's premise that there is a fundamental right to recover unlimited damages from governmental entities performing governmental functions. The vast majority of other jurisdictions considering the issue have reached a conclusion supportive of my own, that the right to bring an action for the recovery of damages (and the right to sue a particular party) is not fundamental for purposes of equal protection analysis, but instead, subject to a rational basis review.[40]

40. The majority of cases discovered upon review have applied the rational basis test and have upheld governmental immunity and other relevant legislation. *See, e.g., Duke Power Co. v. Carolina Envtl. Study Group,* 438 U.S. 59, 93–94, 98 S.Ct. 2620, 2640–2641, 57 L.Ed.2d 595 (1978) (standard implicitly applied); *Wilson,* 669 P.2d at 572 (lesser standard implicitly applied); *Fritz v. Regents of Univ. of Colo.,* 196 Colo. 335, 338–39, 586 P.2d 23, 25 (1978) (en banc); *Ryszkiewicz,* 193 Conn. at 598–599, 479 A.2d at 799–800, and cases cited therein (vast majority of courts apply rational basis test); *Jetton v. Jacksonville Elec. Auth.,* 399 So.2d 396, 399 (Fla.App.), *review denied,* 411 So.2d 383 (1981); *Packard v. Joint School Dist. No. 171,* 104 Idaho 604, 608–09, 661 P.2d 770, 774–75 (Idaho Ct.App.1983) (citing *Leliefeld v. Johnson,* 104 Idaho 357, 659 P.2d 111 (1983)); *Winston,* 636 S.W.2d at 327–30; *Estate of Cargill v. City of Rochester,* 119 N.H. 661, 666, 406 A.2d 704, 707–08 (1979), *appeal dismissed,* 445 U.S. 921, 100 S.Ct. 1304, 63 L.Ed.2d 754 (1980); *Robson,* 63 Pa.Cmwlth. at 255–56, 437 A.2d at 1276; *Sambs,* 97 Wis.2d at 370, 377–78, 293 N.W.2d at 511, 514; *Stanhope,* 90 Wis.2d at 837–45, 280 N.W.2d at 716–20; *Yotvat,* 95 Wis.2d at 363–65, 290 N.W.2d at 528–29; *Troyer,* 722 P.2d at 165, and cases cited therein.

In this regard, courts have taken several different approaches in upholding the constitutionality of governmental immunity statutes as they specifically shield an employee's liability. Some courts holding that government employees are immune from liability have done so without significant reference to equal protection rights.[41] Others have held that those persons who seek recovery against private tort-feasors are a different classification of persons than those who seek recovery against the state or its employees, thus justifying the fact that the latter group may be treated differently.[42]

In contrast, while applying an equal protection analysis in comparable and somewhat different contexts, many courts have summarily and/or implicitly upheld an employee's immunity from liability.[43] In doing so, several courts seemingly recognize the wisdom of the legislature in protecting governmental employees from liability in many instances since "no [governmental] entity … can act otherwise than through individuals, i.e., officials, officers, or employees."[44]

Finally, *Garcia v. Albuquerque Public Schools Board of Education*,[45] *Yotvat v. Roth*,[46] and *Martinez v. California*[47] are representative of those decisions which have explicitly found constitutional the granting of immunity to governmental employees. In *Garcia*, the court reviewed what it considered to be essentially an equal protection challenge to the statutory immunity of public employees. In concluding that the legislature was merely being consistent in waiving immunity for public employees on the same basis as for public entities, the court noted a rational basis:

> [I]f public employees were not immune from liability, the government would be responsible for all claims against the public employees and there would be no governmental immunity. Immunity for public employees is also essential to insure the unhampered performance of their governmental duties. If every action taken by a public employee is subject to judicial review, he will be reluctant to take actions which are necessary for the good of the general public.[48]

In comparison, the Court in *Yotvat* enumerated five considerations underlying the immunity of public employees which constituted a rational basis for distinguishing between the victims of private and public employee tort-feasors.[49] And in *Martinez*,

---

**41.** See, e.g., Begay v. State, 104 N.M. 483, 486, 723 P.2d 252, 256–57 (N.M.Ct.App.1985), rev'd on other grounds, Smialek v. Begay, 104 N.M. 375, 721 P.2d 1306 (N.M.), cert. denied, 497 U.S. 1020, 107 S.Ct. 677, 93 L.Ed.2d 727 (1986).

**42.** See, e.g., O'Dell v. School Dist. of Independence, 521 S.W.2d 403, 409 (Mo.1975) (en banc), superseded by statute as stated in Bartley v. Special School Dist. of St. Louis County, 649 S.W.2d 864 (1983); Troyer, 722 P.2d at 165.

**43.** See, e.g., Bell v. Chisom, 421 So.2d 1239, 1242 (Ala.1982); Bonds v. Calif. ex rel. Highway Patrol, 138 Cal.App.3d 314, 322, 187 Cal.Rptr. 792, 797 (1982); Seifert v. Standard Paving Co., 64 Ill.2d 109, 116, 355 N.E.2d 537, 539–41 (1976), overruled on other grounds, Rossetti Contracting Co. v. Court of Claims, 109 Ill.2d 72, 92 Ill.Dec. 521, 485 N.E.2d 332 (1985); Anderson v. City of Detroit, 54 Mich.App. 496, 499, 221 N.W.2d 168, 169–70 (1974); Green–Glo Turf Farms, Inc. v. State, 347 N.W.2d 491, 494–95 (Minn.1984); Sena School Bus Co. v. Board of Education of Sante Fe Public Schools, 101 N.M. 26, 29, 677 P.2d 639, 642 (N.M.Ct.App.1984); Lumpkin v. Albany Truck Rental Services, Inc., 70 A.D.2d 441, 442, 421 N.Y.S.2d 714, 716 (N.Y.App.Div. 1979).

**44.** Cornwall v. Larsen, 571 P.2d 925, 938 (Utah 1977) (Crockett, J., concurring); see, e.g., Troyer, 722 P.2d at 160–62; infra note 52 and accompanying text; cf. Frank v. State, 613 P.2d 517, 520 (Utah 1980) (contrary to reason to deny governmental immunity to a public employer and then grant it to the very employee allegedly causing injury).

**45.** 95 N.M. 391, 622 P.2d 699 (N.M.Ct.App.1980).

**46.** 95 Wis.2d 357, 290 N.W.2d 524.

**47.** 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481, reh'g denied, 445 U.S. 920, 100 S.Ct. 1285, 63 L.Ed.2d 606 (1980).

**48.** 95 N.M. at 394–95, 622 P.2d at 702–03.

**49.** 95 Wis.2d at 365, 290 N.W.2d at 529. The factors identified included:

> "(1) The danger of influencing public officers in the performance of their functions by the threat of lawsuit; (2) the deterrent effect which the threat of personal liability might have on those who are considering entering public service; (3) the drain on valuable time

the United States Supreme Court accepted California's conclusion that a rational relationship existed between the state's purpose and the statute giving immunity to governmental employees making parole decisions:

> In fashioning state policy in a "practical and troublesome area" like this, the California Legislature could reasonably conclude that judicial review of a parole officer's decisions "would inevitably inhibit the exercise of discretion". That inhibiting effect could impair the State's ability to implement a parole program designed to promote rehabilitation of inmates as well as security within prison walls by holding out a promise of potential rewards. Whether one agrees or disagrees with California's decision to provide absolute immunity for parole officials in a case of this kind, one cannot deny that it rationally furthers a policy that reasonable lawmakers may favor.[50]

Such rationale is persuasive.

In construing the language of article I, section 11 of the Utah Constitution, we view the common law as it existed at the time the constitution was adopted. Since the principle of sovereign immunity was a well-settled principle at that time, the chal-

lenged provisions of the Utah Governmental Immunity Act do not deprive plaintiffs of any remedies or property rights. Therefore, article I, section 11 of the Utah Constitution cannot be extended in support of a right to full and unlimited tort recovery.[51] And allowing suits against governmental employees contrary to Utah Code Ann. § 63–30–4(3) and (4) would impair the state's ability to perform its duties and effectively result in indirect suits against governmental entities which are required to indemnify such employees pursuant to the Indemnification of Public Officers & Employees Act.[52] Such result would thwart the objectives of the Governmental Immunity Act. Additionally, we have previously held that section 63–30–4, granting immunity to state employees, does not contravene article I, section 11 of the Utah Constitution, inasmuch as the plaintiffs in such situations have the opportunity to seek redress in the courts.[53]

Accordingly, under the facts of this case, the right to full legal redress from a state governmental entity and its employees performing governmental functions is not an independent fundamental right entitled to strict scrutiny in every instance.[54] Similar-

---

caused by such actions; (4) the unfairness of subjecting officials to personal liability for the acts of their subordinates; and (5) the feeling that the ballot and removal procedures are more appropriate methods of dealing with misconduct in public office."
(Quoting *Lister v. Board of Regents of the Univ. of Wis. System,* 72 Wis.2d 282, 299, 240 N.W.2d 610, 621 (1976)); *cf. DuBree v. Pennsylvania,* 481 Pa. 540, 542–543, 393 A.2d 293, 295–96 (1978) (noting considerations for determining whether an official should be immune from liability), *cited and applied in Pine v. Synkonis,* 79 Pa.Cmwlth. 479, 482–88, 470 A.2d 1074, 1076–78 (1984) (non-equal protection case).

**50.** 444 U.S. at 282–83, 100 S.Ct. at 557–58 (presented as due process challenge) (quoting *McGinnis v. Royster,* 410 U.S. 263, 270, 93 S.Ct. 1055, 1059, 35 L.Ed.2d 282 (1973); *United States ex rel. Miller v. Twomey,* 479 F.2d 701, 721 (7th Cir.1973), *cert. denied,* 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974)), *cited in Garcia,* 95 N.M. at 395, 622 P.2d at 703.

**51.** *See Ryszkiewicz,* 193 Conn. at 598, 479 A.2d at 799. Although plaintiffs do not specifically challenge the constitutionality of the Utah Governmental Immunity Act under Utah's open

courts provision in article I, section 11, I reiterate our conclusion in *Madsen v. Borthick:*

> Sovereign immunity—the principle that the state cannot be sued in its own courts without its consent—was a well-settled principle of American common law at the time Utah became a state. Article I, Section 11 of the Utah Constitution, which prescribes that all courts shall be open and persons shall not be barred from using them to redress injuries, was not meant to create a new remedy or a new right of action. Consequently, Article I, Section 11 worked no change in the principle of sovereign immunity, and sovereign immunity is not unconstitutional under that section.

658 P.2d at 629 (citations omitted).

**52.** Utah Code Ann. §§ 63–48–1 to –7 (repealed in 1983 & replaced by Utah Code Ann. §§ 63–30–36, –37, –38 (1986 & Supp.1988)); *see also Garcia,* 95 N.M. at 394, 622 P.2d at 702; *supra* notes 40–51.

**53.** *Payne ex rel. Payne v. Myers,* 743 P.2d 186, 190 (Utah 1987).

**54.** Holding otherwise improperly invalidates the power of the legislature to promote the public

775 P.2d—10

ly, any intermediate review is also inappropriate in this case, as it has no application in dealing with the constitutionality of the well-settled principles of sovereign immunity.[55]

Thus, since the rights to full redress for injury asserted by plaintiffs are not fundamental and do not involve a suspect class or merit intermediate scrutiny, the appropriate equal protection analysis is the "rational basis standard" whereby the pertinent classifications must be sustained unless they are arbitrary and bear no relationship to a legitimate governmental interest.[56]

The principles of such analysis are as follows:

1. The equal protection clause of the 14th Amendment does not take from the state the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis, and therefore is purely arbitrary.

2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety, or because in practice it results in some inequality.

3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed.

4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary.[57]

Those provisions of the Utah Governmental Immunity Act which plaintiffs assert deny them equal protection of the law need be examined in light of the foregoing analytical framework. The issue to be addressed is whether the statutes have a reasonable and rational relationship to a legitimate legislative objective.[58] Notwithstanding statements to the contrary, we have heretofore held the operation of a "governmentally-owned health care facility such as the University Medical Center to be a 'governmental function' as contemplated by the statute prior to amendment."[59] Thus, plaintiffs' rationale and those espoused by my colleagues for overruling

health, safety, morals, and welfare. See *Berry,* 717 P.2d at 677, wherein we discuss the legislature's abolition of certain common law remedies for personal injuries and substitution of other remedies pursuant to the Workmen's Compensation Act, the Occupational Disease Act, and the No–Fault Automobile Insurance Act; *see also supra* notes 40–50.

55. *See supra* notes 10–21 & 40–53 and accompanying text. The United States Supreme Court has used intermediate scrutiny haltingly. *See, e.g., Plyler v. Doe,* 457 U.S. 202, 217–18, 102 S.Ct. 2382, 2395, 72 L.Ed.2d 786, *reh'g denied,* 458 U.S. 1131 (1982); *Michael M. v. Superior Court of Sonoma County,* 450 U.S. 464, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981) (gender); *Lalli v. Lalli,* 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978) (illegitimacy).

56. *Robson,* 63 Pa.Cmwlth. at 255, 437 A.2d at 1276.

57. *Utah Pub. Employees' Ass'n,* 610 P.2d at 1273–74 (quoting *Lindsley,* 220 U.S. 61, 31 S.Ct. 337). This Court has applied the rational basis test in other cases involving equal protection attacks on various statutory schemes. Recently, in *Malan,* 693 P.2d at 670–75, we applied the rational

basis test in evaluating the constitutionality of the Utah guest statute. Therein, we held that a statute may treat individuals differently and yet meet constitutional equal protection and access to the court requirements if (1) the law applies equally to all persons within a class, and (2) the statutory classification and different treatment given the class are based upon differences that have a reasonable tendency to further the statutory objectives. Furthermore, a classification may be reasonable even though some inequality results, *Crowder v. Salt Lake County,* 552 P.2d 646, 657 (Utah 1976) (upholding notice requirements of the Governmental Immunity Act); differing treatment of individuals does not necessarily deny equal protection as long as the classification has a reasonable relationship to a proper and lawful purpose, *Child,* 538 P.2d at 187; and the presumption of constitutionality may justify discrimination even without actual evidence demonstrating a rational basis for the distinctions made, *cf. Baker,* 607 P.2d at 235–36 (court will not strike down enactment unless party attacking it clearly establishes that a constitutional provision has been violated).

58. *See Hart Health Studio,* 577 P.2d at 118.

59. *Frank,* 613 P.2d at 519.

and/or mischaracterizing this determination are unpersuasive and inaccurate. Nevertheless, the legislature has not specifically set forth its rationale for immunizing governmental employees or imposing a monetary limitation on recovery in the Governmental Immunity Act. It is our obligation to locate, if possible, a rationale that might have influenced the legislature and that reasonably upholds a legislative determination.[60] Certainly, the rationale which the Court locates might be disputable. However, it is not our task to judge the wisdom of the rationale or the legislation. The legislature gathers applicable data and chooses the course to follow.[61]

As in other cases, defendants herein essentially assert that the Governmental Immunity Act limits the state's liability and thus serves the legitimate public purpose of protecting the state's treasury, thereby safeguarding public funds and the government's ability to discharge public responsibility while affording some recovery to those injured by governmental tort-feasors.[62] Further, defendants contend that unlimited liability makes it increasingly difficult, if not impossible, to purchase sufficient insurance coverage. They emphasize the high risk involved in activities such as the operation of a hospital which must be performed by governmental entities. And they point out that all such functions and services entail a potential for civil liability far beyond the potential liability of nonessential governmental entities or other corporations or persons in the private sector.

Government engages in activities of a scope and variety far beyond those of any private business, and governmental operations affect a large number of people.[63] A governmental unit limited in fiscal resources may lack the capability to withstand the results of substantial unanticipated liability.[64] Moreover, unlimited re-

**60.** *See Sambs,* 97 Wis.2d at 371, 293 N.W.2d at 512; *Winston,* 636 S.W.2d at 328; *State v. Hart,* 89 Wis.2d 58, 66, 277 N.W.2d 843, 847 (1979). As noted by one annotator, to balance the public's right of action pursuant to a waiver of immunity with the government's need to protect fiscal resources from potentially devastating claims, several jurisdictions have adopted statutes limiting the amounts or kinds of damages recoverable against a governmental tortfeasor. Most of these courts uniformly recognize that legislative bodies have the power to prescribe such limits and that the limits are constitutionally valid. Though they may abridge the remedies of victims of government as opposed to private tort-feasors, damage limitation statutes are almost unanimously viewed as having a rational relationship to the government's need to provide for effective risk management. Annotation, *Validity and Construction of Statute or Ordinance Limiting the Kinds or Amount of Actual Damages Recoverable in Tort Action Against Governmental Unit,* 43 A.L.R.4th 19 (1986), and cases cited therein, including *Cauley v. City of Jacksonville,* 403 So.2d 379, 387 (Fla.1981) (citing *Duke Power Co.,* 438 U.S. 59, 98 S.Ct. 2620); *see also supra* note 40; *infra* notes 62–74 and accompanying text.

**61.** *Sambs,* 97 Wis.2d at 371, 293 N.W.2d at 512; *Masich,* 113 Utah at 126–27, 191 P.2d at 625.

**62.** *Winston,* 636 S.W.2d at 328; *Sambs,* 97 Wis.2d at 372–74, 293 N.W.2d at 512–13; *Stanhope,* 90 Wis.2d at 840–42, 280 N.W.2d at 718–19 (citing Van Alstyne, *Governmental Tort Liability: A Decade of Change,* 1966 U.Ill.L.Forum 919 [hereinafter Van Alstyne] ). It has been noted

that governmental immunity was historically believed necessary and important in order to protect governmental funds from depletion by payment of damage claims resulting from a state's own liability or the indemnification of torts committed by its agents or employees in the performance of state-imposed duties. Therefore, it was reasoned that the individual victim's need to be made whole must give way to the public welfare. Although some may regard governmental tort immunity as mistaken and unjust, limitations on public tort responsibility continue to exist. *Sambs,* 97 Wis.2d at 372–74, 293 N.W.2d at 512–13; Van Alstyne, 1966 U.Ill.L.Forum at 975, 979–80; *Standiford v. Salt Lake City Corp.,* 605 P.2d 1230, 1232–37 (Utah 1980) (proprietary-governmental distinction) (citing Van Alstyne); *Crowe v. John W. Harton Memorial Hosp.,* 579 S.W.2d 888, 891–93 (Tenn.Ct.App.1979); *supra* note 40 and accompanying text.

**63.** *Sambs,* 97 Wis.2d at 376, 293 N.W.2d at 514.

**64.** As the Wisconsin Supreme Court has noted, the rationale that limited liability against governmental entities is necessary to protect governmental functions is not entirely without pragmatic support. If public entities with substantial fiscal resources were involved, the financial problem may be minimal. On the other hand, for smaller governmental entities or those with more limited financial powers, liability judgments could have serious consequences. *Stanhope,* 90 Wis.2d at 842, 280 N.W.2d at 719. In enacting the Governmental Immunity Act, the legislature could have foreseen the need to

covery to all victims of governmental tort-feasors may seriously impair the ability of government to govern efficiently and effectively.[65] Therefore, it is the legislature's duty and prerogative to evaluate and balance the risks, the possible exposure to liability, the need to compensate citizens for injury, the availability and cost of insurance, and the financial condition of governmental units. It is the legislature's function to structure statutory provisions capable of protecting the public interest by fairly and reasonably reimbursing victims while maintaining governmental services by realistically evaluating the financial burden to be placed on the taxpayers.[66]

In contrast, plaintiffs maintain the claim raised in similar cases that permitting unlimited recovery of tort claims from the governmental entity and the individual governmental employee tort-feasor would not create a fiscal nightmare as both the government and the individual, without significant impact on the state treasury, can obtain liability insurance adequate to protect themselves in such actions. Hence, the argument continues, there is no need to limit the liability amount or restrict the waiver to those entities enumerated in the Act.[67] While this contention may be true,

it misses the point. The rational basis test for equal protection does not require that the legislative objective be compelling or that the legislature utilize the best or wisest means to achieve its goals.[68] Rather, there need only be a rational relationship between the statutory classifications of governmental tort victims and the object of the legislation to enhance recovery in most cases while limiting the financial burden the exercise of such remedies would impose on taxpayers.[69]

Given the realities of modern government and the litigiousness of our society, the legislature, in enacting the Governmental Immunity Act, had a rational basis on which to fear that unrestricted liability involves the risk of insolvency or grave financial burdens. Fiscal resources must be available and preserved to pay for essential governmental services; public financial burdens must be kept at reasonable levels; it is for the legislature to decide how limited public funds will be spent. It is also within the legislature's power to preserve sufficient public funds to insure that government will be able to continue providing those services it believes will benefit its citizenry.[70]

---

limit the potential financial distress certain to be imposed on governmental units (including individual cities and towns) by large judgments or high insurance premiums. Indeed, the legislature could have reasonably determined that imposing liability upon governmental entities for justifiable participation in areas such as medical services may discourage many communities (particularly the smaller ones in this state) from providing medical aid, as the financial commitment necessary to insure all claims resulting from that aid could be disabling in its effect. *See Stanhope,* 90 Wis.2d at 842–43, 280 N.W.2d at 719; Van Alstyne, *supra* note 62, at 971 n. 365.

65. *Sambs,* 97 Wis.2d at 376–77, 293 N.W.2d at 514.

66. *See Winston,* 636 S.W.2d at 328–29; *Sambs,* 97 Wis.2d at 377, 293 N.W.2d at 509, 514–15; *Stanhope,* 90 Wis.2d at 843, 280 N.W.2d at 719.

67. *Winston,* 636 S.W.2d at 328.

68. *Id.; Stanhope,* 90 Wis.2d at 843, 280 N.W.2d at 719.

69. *Winston,* 636 S.W.2d at 328; *Sambs,* 97 Wis.2d at 366–68, 375–77, 293 N.W.2d at 509–10,

514; *Stanhope,* 90 Wis.2d at 841–43, 280 N.W.2d at 718–19. Since the Act's immunity waiver provisions afford a remedy to all without qualification and since it is impossible to achieve complete equality in damage awards given the state's right to limit the amount thereof, the equal protection clauses of the Utah Constitution and the fourteenth amendment of the United States Constitution are not offended by the Act's damage limitation provisions. *See supra* notes 35, 40 & 60 and accompanying text; *infra* notes 70 & 71 and accompanying text.

70. *Stanhope,* 90 Wis.2d at 842–43, 280 N.W.2d at 719. It is also to be observed that since the state could choose to claim absolute sovereign immunity for torts committed by a governmental entity, it is therefore entitled to waive such immunity and to impose reasonable monetary limits thereon. Since the legislature provided for the right and the remedy when it enacted the Governmental Immunity Act, it is within its judgment to limit the maximum recoverable amount. *See Madsen,* 658 P.2d at 629–30; *Winston,* 636 S.W.2d at 328; *Sambs,* 97 Wis.2d at 372, 293 N.W.2d at 512 (quoting *Holytz v. City of Milwaukee,* 17 Wis.2d 26, 40, 115 N.W.2d 618, 625 (1962)); *Stanhope,* 90 Wis.2d at 839, 280 N.W.2d at 717.

Further, concerning the "cap" on damages in its governmental immunity statute, the Nevada Supreme Court stated:

It seems to us quite impossible to devise a scheme of equality in the awards of damages. The "total damages sustained" by a claimant is an uncertain amount in any case. That amount is what negotiation or trial declares it to be, and the variation in result for substantially similar injuries is remarkable. A percentage of the "total damages sustained" is equally uncertain. In the nature of things, equality of treatment as to the amount of damages cannot be achieved, and in our view, the equal protection clause has no bearing upon the subject. It was within the legislative power to limit recovery.[71]

In view of such, the views espoused in the main opinion that the monetary limitations imposed by the subject statutes are "drastic," "arbitrary," and "absurdly low," thus egregiously infringing upon plaintiffs' right to a jury trial on the question of damages,[72] are unwarranted. As noted by other courts, while the value of the recovery limitation levels prescribed by governmental immunity statutes may have, through inflation or otherwise, substantially decreased to seemingly insufficient amounts,

[s]o long as the statute is constitutional, we have no intrinsic ability to review its inherent wisdom or, if it seems unwise, the power to change it. Whenever lines are drawn by legislation, some may seem unwise, but the responsibility for drawing these lines rests with the legislature and judicial review is limited. We [can but] agree with the sentiments expressed by other courts which have urged their

legislatures to periodically review their statutory provisions which limit tort recoveries.[73]

This Court errs in assuming without empirical evidence that it is in a better position than the legislature to consider the financial integrity of the state and the reasonableness of monetary limitations available to strike the necessary balance between "sufficient" and "insufficient" recovery in future cases.

When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity, or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the Legislature must be accepted unless we can say that it is very wide of any reasonable mark.[74]

Such is not the case here.

Accordingly, I conclude that the challenged provisions of the Utah Governmental Immunity Act clearly relate to a permissible legislative objective and are neither discriminatory, arbitrary, nor oppressive in their application. The Act does not violate plaintiffs' equal protection rights or their access to the courts. It provides a fair means of recovery against governmental entities for the negligent acts of their employees and officials.[75]

---

71. *State v. Silva,* 86 Nev. 911, 916, 478 P.2d 591, 594 (1970) (citation omitted).

72. *See* main opinion at 363, 365 & 366.

73. *Leliefeld,* 104 Idaho at 375, 659 P.2d at 129 (footnote and citations omitted), *cited in part in Packard,* 104 Idaho at 609, 661 P.2d at 775 (value of recovery limitation has decreased); *see also Estate of Cargill,* 119 N.H. at 669–670, 406 A.2d at 708–09; *Sambs,* 97 Wis.2d at 368, 293 N.W.2d at 510; *cf. Johnson,* 273 Ind. at 400–01, 404 N.E.2d at 602 (right to have jury

assess damages is not offended by statutory limitations in medical malpractice legislation).

74. *Louisville Gas & Electric Co. v. Coleman,* 277 U.S. 32, 41, 48 S.Ct. 423, 426, 72 L.Ed. 770 (1928) (Holmes, J., dissenting), *quoted in Leliefeld,* 104 Idaho at 375 n. 17, 659 P.2d at 129 n. 17.

75. *See supra* notes 52–54 and accompanying text; *see also Berry,* 717 P.2d 670, 677 ("[L]egal causes of action which provide remedies that protect section 11 interests may, in some cases,

I would affirm the trial court's order and uphold the constitutional validity of the challenged provisions of the Utah Governmental Immunity Act.

HOWE, Associate C.J., concurs in the dissenting opinion of HALL, C.J.

have to yield to the power of the Legislature to promote the public health, safety, morals, and

welfare" (footnote omitted).).